93 N.J. Super. 272 (1966)
225 A.2d 699
SHAHMOON INDUSTRIES, INCORPORATED, A CORPORATION OF DELAWARE, APPELLANT,
v.
DEPARTMENT OF HEALTH, STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 1966.
Decided December 12, 1966.
*274 Before Judges CONFORD, FOLEY and LEONARD.
Mr. Samuel Kaufman argued the cause for appellant (Mr. Howard Spear, attorney; Messrs. Kaufman, Kaufman & Kaufman; Mr. John M. Kaufman, of counsel).
*275 Mr. Theodore A. Schwartz, Deputy Attorney General, argued the cause for respondent (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney; Mr. Norman D. Weisburd, Deputy Attorney General, on the brief).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is an appeal from an order of the State Commissioner of Health dated February 16, 1966, entered after hearing on a cease and desist order previously issued by the State Department of Health ("Department" hereinafter), by which order of February 16 appellant, operator of a cast iron foundry ("Shahmoon" hereinafter), was directed to (1) "cease discharging solid particles into the outdoor atmosphere from stacks or chimneys in violation of Chapter VII of the New Jersey Air Pollution Code on or before January 1, 1967"; (2) to "take interim measures to minimize solid particle discharges until full compliance is achieved," specifying four specific technical recourses for that purpose; and (3) to submit progress reports at three-month intervals concerning the progress of its air pollution program.
The first legislation attacking the air-pollution menace in this State on a comprehensive basis was the Air Pollution Control Act (1954) (L. 1954, c. 212), discussed at length in Moran, "The Air Pollution Control Act and its Administration," 9 Rutgers L. Rev. 640 (1955); see also Cowan, "Air Pollution Control in New Jersey," 9 Rutgers L. Rev. 609 (1955); New Jersey Dept. of Health v. Roselle, 34 N.J. 331, 347-349 (1961). Basically, rule-making under the act is by an Air Pollution Control Commission, while enforcement is vested in the State Department of Health. The act as originally adopted stressed conciliation and persuasion of offending industries and was not cast in terms of aggressive enforcement. See Moran, op. cit., passim. Tighter enforcement machinery was later provided by statutory amendment. L. 1962, c. 215.
Of particular interest, for present purposes, are the changes in procedure effected by the 1962 amendment for cases wherein, *276 after complaint and investigation by the Department, it found that the Code was being violated. Under the 1954 act the Department was thereupon directed to attempt to eliminate the violation "by conference, conciliation and persuasion" (§ 14). Only after failure of such efforts was provision made for service of charges upon the offending person and the conduct of a hearing thereon (§ 15). An order for compliance was issuable only after determination of guilt by the Department at such hearing (§ 18). Under the 1962 amendment, however, a desist order may be issued by the Department without advance hearing whenever, after departmental investigation, it is discovered that a violation is taking place. N.J.S.A. 26:2C-14. Preliminary conciliation efforts are not mandated. Any person "aggrieved" by an order is, upon application, "entitled to a hearing before the department." The Department is directed within 30 days after hearing to issue an order "modifying, approving or disapproving its prior order." N.J.S.A. 26:2C-14.1.
On January 6, 1965 personnel of the Department, including Herbert I. Wortreich, Supervising Public Health Engineer in the Air Sanitation Program of the Department, visited the Phillipsburg plant of Shahmoon and made an investigation and inspection of its facilities from an air pollution standpoint. This included receipt of technical information from Shahmoon representatives as to the foundry process, which, after study and calculation, led the Department to conclude that emission of solid particles from the cupola (metal melting furnace) stack of the foundry exceeded the quantities allowed by the Air Pollution Code, chapter VII, § 2.
On February 15, 1965 representatives of the Department met with Shahmoon personnel in Trenton and informed them of and discussed the conclusions as to violation. This meeting was reviewed in a letter from the Department to Shahmoon dated February 17, 1965, wherein it was stated that "Although there may exist a difference of opinion as to the degree, your representatives agree with us that the emissions are *277 excessive." Reference was also made to an agreement that Shahmoon would submit progress reports on a monthly basis as to steps to be taken to accomplish "adequate control" of the emissions.
On August 16, 1965 the State Commissioner of Health issued an order to appellant advising it that it was in violation of the Code and ordering it to cease discharging solid particles into the atmosphere in violation of the Code on or before February 16, 1966. Shahmoon requested a hearing on the order and same was conducted before an authorized hearing officer of the Department. A report of the hearing, findings and recommendations was filed by the officer on February 16, 1966, containing the conclusion that
"5. Evidence presented during the course of this hearing establishes the fact that on January 6, 1965, the applicant's plant discharged solid particles into the outdoor atmosphere from stacks or chimneys in excess of that allowed under the provisions of Chapter VII of the New Jersey Air Pollution Control Code."
The report also adverted to changes in production and production methods under consideration by Shahmoon and recommended extension of the compliance date to January 1, 1967. It was also recommended that Shahmoon be directed to take certain designated interim measures and to report in relation to progress thereon at three-month intervals. Thereupon the State Commissioner issued the order now under appeal, which embodied in toto the recommendations of the hearing officer.
The primary assault by appellant in this appeal is upon the substantiality of the State's evidence to support the determination of violation of the Code. There is no dispute concerning the fact that application of the rather complex formula set forth in the Code works out to the quantities of four pounds per hour for coarse particles (44 or more microns) and 66 pounds per hour for fine particles (less than 44 microns) as the maximum permissible effluent into the atmosphere for this plant. Wortreich's testimony at the hearing on *278 behalf of the Department was that the plant was emitting at the hourly rate of 19.5 pounds for coarse particles and 351 pounds for fine.
The State did not at the hearing specifically qualify Wortreich as an expert in the air pollution detection field, nor did appellant challenge his qualifications in that regard. In view of the nature of the attack upon his methods and conclusions, however, the official Civil Service "definition" of Wortreich's job title, "Supervising Public Health Engineer (Air Sanitation)," is significant.[1] The educational requirement for the position is "Graduation from an accredited college with a Bachelor's degree in civil, sanitary, chemical or mechanical engineering." The experience requirement is four years of full-time professional experience in public health work, two years of which shall have included supervisory responsibilities in air pollution investigation and control (or a master's degree in public health as substitute for one year of experience).
Wortreich gave the following testimony. He visited the Shahmoon plant on January 6, 1965 and was given information by company officials as to the nature of the operation (cast iron pipe foundry), the nature and kind of raw materials fed into the furnace per hour, and the rate of production of finished material. He observed a "cone washer" (type of air pollution control device) on the cupola stack.
The witness testified that there are two types of tests of the amount of particle effluent from such an operation. One is by "direct test right on the equipment itself by taking a stack sample." He did not conduct such a test in the present case *279 because the procedure is "very difficult, and complicated," and, in this instance, would be "extremely costly." While the Air Pollution Code authorizes the Department to make such direct tests, if the owner of the plant furnishes certain facilities, it does not proscribe other forms of testing. The other type of test, that employed by Wortreich in this case, involves the application of certain empirical assumptions based upon respected literature in the field to the known physical facts concerning the industrial process under analysis. The details of the method are revealed by Wortreich's testimony as to what he did.
He was informed at the January 6, 1965 visit to the plant by appellant's representatives that raw materials, metallic and other, were fed to the unit at the average hourly rate of approximately 40 tons (35 tons scrap iron). To that figure he applied four assumptions: (a) if uncontrolled, this type of cupola would emit into the atmosphere 1% by weight of solid particles; (b) of the particles emitted, 50% would be coarse and 50% fine; appellant's "cone washer" operates to trap and to preclude from atmospheric emission (c) 95% by weight of the coarse particles and (d) 10% of the fine. The mathematical results of the application of these factors are represented by the figures stated above as to the quantities of coarse and fine particle effluent per hour concluded by Wortreich to have been emitted by Shahmoon's stack as of January 6, 1965.
As his main reliance for use of the percentage factors mentioned, Wortreich cited a document he himself had prepared, intended for general departmental purposes, entitled "A Guide for the Evaluation of Solid Particle Emissions from Ferrous Foundry Operations" (hereinafter referred to as the "Guide"). He testified he compiled this from information contained in a list of some 22 technical publications in the field. At no time during the two hearings in this matter (which were over a month apart) did Shahmoon challenge the technical accuracy of the Guide or the soundness of its contents and tables as against the publications cited therein as *280 authority or on the basis of its own expert proofs. Indeed, its opposing expert witness himself relied, in the main, on the same tables set forth in the Guide as did Mr. Wortreich, although he arrived at conclusions of nonviolation of the Code by the premise of smaller quantities of raw material fed to the cupola and generally more favorable assumptions as to the other controlling factors mentioned above than did Wortreich.
In illustration of Wortreich's approach, he selected a 1% rate for emission of solid particles from a cupola of this type on the basis of the indication in the Guide of a general range of 0.5 to 2.5% of feed rate, or 10 to 50 lbs. per ton fed. Wortreich testified that in this and in his other selections of factors to be used he gave the appellant the benefit of the doubt. But, as will be presently seen, there is some question as to whether this is so. In respect of the factor just mentioned, Shahmoon makes much of the conceded error by Wortreich in using the Guide table for a "cold blast" cupola when in fact this is a "hot blast" cupola. But the variation does not seem very material since the Guide specifies a rate of 6 to 45 lbs. per ton fed for hot blast. As 1% is equivalent to 20 lbs. per ton, Wortreich's factor is still well below the median of a 6-45 lb. range. There is no evidence in the case justifying a lesser estimate for solid particle emission, assuming the reliability of the table in the Guide.
The Guide indicates a range of 45% to 75% of total emission for coarse particles (before screen-out). As noted, Wortreich broke down the effluent as between the coarse and fine particles on a 50-50 basis, or near the low point on the range. This has both favorable and unfavorable aspects in relation to Code compliance. It is unfavorable in that a higher rate for coarse particles would give the industry the benefit of the much more efficient rate of screen-out for coarse as compared with fine particles indicated by the Guide. But it is favorable in that the allowable quantum of coarse particle effluent under the Code is much smaller than for fine (4 lbs. per hour as against 66 lbs.). The State contends that the net over-all effect of a smaller percentage allocation for coarse particles *281 favors the industry, and appellant has not undertaken to demonstrate the contrary.
The Guide rates the cone-type washer with which appellant's cupola was equipped as having a "collection" or screen-out efficiency of 80-99% in relation to coarse and 10-25% as to fine particles. As noted above, Wortreich here used 95% as the factor for coarse and 10% as the factor for fine. The 95% factor is obviously on the favorable side for the industry but the 10% is not, and appellant attacks the latter. The State responds that this particular washer was regarded by the Department as unusually inefficient in respect of fine particles and that its inefficiency is demonstrated by "modifications" of the washer adopted by Shahmoon subsequent to the inspection date (January 6, 1965). However, we read the testimony to indicate that an entirely new washer was designed and introduced by Shahmoon rather than a mere modification of the old. There was no specific testimony by the State that the particular washer in use on January 6, 1965 was of lesser efficiency in relation to fine particles than the average such equipment, for which, as noted, the Guide reflected an efficiency range of 10-25% while at the same time commenting that the cone-type washer is "of doubtful value for fine particles."
However, the point in question does not appear to be one of substantial materiality. Even were this washer credited with the maximum rated screening efficiency of 25% as to fine particles, the employment thereof, along with an acceptance of the remainder of Wortreich's method, facts and factors, would alter his conclusion of the net effluent of fine particles into the air only from 390 lbs. per hour to 293 lbs. This would still greatly exceed the Code allowance of 66 lbs.
Aside from its attack on Wortreich's "assumptions" (as to which see infra), Shahmoon sought to counter his conclusions of Code violation through the testimony of its "Assistant Superintendent of Metallurgy," William T. Maher. He first testified that the average total raw material fed to the cupola as of January 6, 1965 was 35 1/4 tons per hour, of which 31.9 *282 tons were metal. This represented a variance of almost five tons from what Wortreich testified the appellant's representatives told him at the plant in January 1965, and thus created an issue of credibility for the trier of the facts. Proceeding from that base, Maher selected his own percentage factors as to the same items dealt with by Wortreich, relying also upon the tables set forth in the Guide, and arrived at ultimate conclusions of net emission of 2.75 lbs. of coarse particles and 55.50 lbs. of fine, thus coming within the Code allowances of four and 66 lbs., respectively.
Appellant's first point of argument is that the State's proofs consisted of "assumptions" rather than competent evidence. The "assumptions" referred to are the percentage factors mentioned. If there was a reliable probative basis for their employment, they are not in our view vulnerable as incompetent. Wortreich's testimony was clearly in the category of expert opinion testimony, and that kind of testimony frequently proceeds upon the basis of comparable assumptions. Appellant did not at the hearing, as noted above, challenge Wortreich's status as an expert in this field. If it had, we entertain little doubt, judging from the make-up of the Guide, the explanatory testimony, and the Civil Service specifications for his position, that Wortreich could and would have demonstrated his expertise. He had with him at the hearing all of the publications to which the Guide adverted in support of the information and tables contained therein. Appellant never sought to impugn them, either on their merits as authorities in the field or as supportive of the Guide; nor did it, on cross-examination of Wortreich, ask him to point to the specific sources in the cited literature for any of the statements of fact in the Guide relied upon in his testimony. We have already seen that appellant's own technical expert himself relied on the Guide in formulating his conclusions.
It is commonplace that where an administrative agency is concerned with technical matters the courts will give weight to its presumed expertise in reviewing its decisions. Cooley's etc., Foundation v. Legalized Games, etc., *283 Comm., 78 N.J. Super. 128, 140 (App. Div. 1963), certif. denied 40 N.J. 212 (1963). Similarly, an initial assumption of competence in the field should be indulged by the courts in assaying the testimony of members of the staff of such an agency assigned to make inspections or tests for compliance with statutory or administrative regulations of a technical nature. Cf. 1 Davis, Administrative Law (Treatise) (1958), § 7.09, p. 445 et seq.; Gellhorn and Byse, Administrative Law  Cases and Comments (1954), pp. 660-666.
Appellant argues that in effect Wortreich's testimony was hearsay to the extent that he relied upon his Guide which, in turn, was based on technical literature not in evidence. This is not a sound objection. The Guide was not relied upon or cited testimonially as proof of the truth of its contents but merely as evidence of what Wortreich considered in arriving at his expert conclusions of violation of the Code by appellant. For this purpose it was unexceptionable. Delaware, L. & W.R. Co. v. City of Hoboken, 10 N.J. 418, 434-435 (1952). Most experts more or less rely upon what they regard as authoritative literature in their fields. That Wortreich did so in this case does not undermine the competence of his testimony but rather adds to its probative weight.
We conclude that insofar as appellant's argument is addressed to the asserted incompetence of Wortreich's testimony because of the lack of qualifications of the witness, the nature of the materials he relied on, or the "assumptions" he used in formulating his conclusions, no merit is shown.
Shahmoon further argues that even using the Department's own guidelines there is at least as great a likelihood that appellant's equipment met the required standard. However, in this regard, all that concerns us is whether the Department's conclusion that appellant was in violation of the Code on the date of the inspection is "supported by substantial evidence on the whole record." Atkinson v. Parsekian, 37 N.J. 143, 149 (1962). We entertain no doubt that in the case at hand such support exists for the quasi-judicial determination of the agency, particularly in view of the wide disparity *284 between the amounts of effluent of both types permitted by the Code and the amounts found to have in fact been emitted by the Department's expert, to whom it obviously accorded substantial weight, as was its right. It was for the agency to decide what force to accord to the testimony of appellant's witnesses as against that of Wortreich in respect of both credibility and weight.
Appellant also contends that whether or not there was a violation on January 6, 1965, the order to desist should be vacated in view of improvements in its equipment and other changes in circumstances since that date. No authority is cited to support that position. If appellant's improvements bring it into conformance with the Code by the postponed compliance date fixed by the Department's adjudicative order, it has nothing to fear. If it fails to do so, the Department should not be deprived of the enforcement sanction constituted by the subsisting desist order.
Lastly, appellant complains of the asserted vagueness and indefiniteness of the order under review. Specifically, the complaint is that the order "fails to inform appellant of the measures to be taken to insure full compliance." The argument thus advanced is not only without legal basis but is not accurate. True, the order does direct that appellant "cease discharging solid particles into the outdoor atmosphere" in violation of chapter VII of the Code prior to January 1, 1967. But it also directs the taking of interim measures in four specific respects which, by clear implication, indicates that doing so will tend toward compliance.
Moreover, an administrative cease and desist order no broader than the violation charged and found in the adjudicative proceeding is ordinarily valid. See 1 Davis, op. cit., § 8.19, pp. 603-611.
We regard New Jersey Dept. of Health v. Roselle, 34 N.J. 331 (1961), as distinguishable. There the court held an injunctive order to "cease violating" the Code which, in turn, directed that "No person shall cause, suffer, allow or permit open burning of refuse," was too broad. The court deemed *285 the directions of such an order insufficiently informative in the context of repetitive fires on appellant's garbage dumps of apparently spontaneous or otherwise mysterious origin (Id., at pp. 350-351). The present situation is obviously distinguishable. Appellant certainly knows the nature and origin of its violation of the Code and what to do to avoid it. Its real problem is achieving compliance within what it deems a reasonable financial outlay  not the lack of technical know-how in effecting such compliance.
The order is not defective in form or breadth.
We feel it necessary, however, notwithstanding appellant has not raised the point, to comment on the form of the findings by the hearing officer and of the order under review. We do so because we are informed that this was one of the first contested proceedings in the Department relative to enforcement of the Code against ferrous foundries, and it is important that the Department observe procedural requirements carefully in this area.
In relation to the issue of violation of the Code, the hearing officer made only the generalized finding of violation quoted in the forepart of this opinion. The hearing developed factual issues (a) as to the quantity of material fed to the cupola per hour and (b) as to the amounts of fine and coarse particles emitted per hour into the atmosphere. The latter issue implicated subordinate differences between the experts as to justifiable assumptions in the several respects discussed above for purposes of computing the probable amounts of coarse and fine solid particles emitted into the atmosphere. It is clearly to be implied that the hearing officer accepted Wortreich's testimony in all of the foregoing respects, but an administrative adjudicative order should not have to be defended on the basis of implied findings when express ones are indicated by the nature of the controversy. The importance of detailed fact-findings in contested administrative proceedings has been stated and reiterated by our courts too often to require citation of authorities here again.
*286 Because we deem requisite findings of basic facts according with Wortreich's testimony to be readily inferable from the finding of ultimate fact by the hearing officer, so that substantial justice is not disserved by an affirmance in this case, and because we deem the public policy behind the Air Pollution Control Act to militate against further delay in the processing of this case at the administrative level, we shall not here remand for the making of detailed findings of fact, as ordinarily we would be inclined to do.
We also note that the order of the Commissioner of Health, here under review, does not expressly adopt the findings, conclusions and recommendations of the hearing officer, as it should have since obviously so intended. However, the intention to do so being evident and no argument to the contrary being made by appellant, we shall assume an implication in the order to that effect.
Affirmed.
NOTES
[1] "DEFINITION Under the direction of the Chief, Air Sanitation Program, Department of Health, has charge of the work programs and staff of the field control operations of the Air Sanitation Control Program; directs and supervises engineering activities of the enforcement section; the technical services and special investigation section and field office operation; designs and supervises field studies of air pollution and air pollution sources; prepares evidence for legal uses; trains subordinates and issues work assignments; establishes work methods, procedures; and assists in air sampling instrument development and in research studies; does related work as required."