100 N.J. Super. 366 (1968)
242 A.2d 21
DEPARTMENT OF HEALTH, STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
OWENS-CORNING FIBERGLAS CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 29, 1968.
Decided April 17, 1968.
*371 Before Judges GOLDMANN, KILKENNY and CARTON.
Mr. James Hunter, III argued the cause for appellant (Messrs. Archer, Greiner, Hunter & Read, attorneys; Mr. W. Thomas Grimm, on the brief).
Mr. Richard J. Sauerwein, Deputy Attorney General, argued the cause for respondent (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant Owens-Corning Fiberglas Corporation (Owens-Corning) appeals from an order and amended order of the State Department of Health (Department) directing that it cease violation of chapter VI, section 2.1 of the New Jersey Air Pollution Control Code (Code) and forthwith take certain specified interim measures to minimize air pollution caused by its plant operations.
The proceedings before the Department were instituted by a complaint dated September 28, 1966, alleging that on ten *372 specified dates during July and August of 1966 Owens-Corning
"did cause, suffer, allow or permit air pollution by emitting substances into the outdoor atmosphere from [its premises in Barrington, Camden County] in such quantities as to be injurious to human or plant life, or property, or to unreasonably interfere with the comfortable enjoyment of life and property in violation of Chapter VI, Section 2.1 of the New Jersey Air Pollution Control Code, a copy of which is annexed hereto and made a part hereof."
Chapter VI, section 2.1 of the Code provides:
"No person shall cause, suffer, allow or permit to be emitted into the outdoor atmosphere substances in quantities which shall result in air pollution."
"Air pollution," as used in chapter VI, is defined in chapter I, section 1.10 of the Code in the same language as appears in the Air Pollution Control Act (1954), N.J.S.A. 26:2C-2:
"`Air pollution' * * * shall mean the presence in the outdoor atmosphere of substances in quantities which are injurious to human, plant or animal life or to property or unreasonably interfere with the comfortable enjoyment of life and property throughout the State and in such territories of the State as shall be affected thereby and excludes all aspects of the employer-employee relationship as to health and safety hazards."[1]
Accompanying the Department's complaint was a notice directed to Owens-Corning of a hearing on October 25, 1966. *373 The hearing began as scheduled and continued over a series of dates until early 1967. The hearing officer throughout all phases of this matter was E. Powers Mincher of the Department. Since chapter VI of the Code does not provide measurable standards in the form of specific limits for emissions to the atmosphere, this first or preliminary hearing was a procedural prerequisite to the issuance of any order, by reason of N.J.S.A. 26:2C-14, third paragraph, which reads:
"In any case where no code, rule or regulation has been promulgated which sets specific limits for emissions to the atmosphere of the type discovered and alleged, no order to cease such emissions shall be issued until the holding of a preliminary hearing thereon which shall be held upon not less than 15 days' notice by the department [State Department of Health] to all interested persons."
On March 9, 1967 State Commissioner of Health Kandle issued the first of the two orders under appeal. It recited that he had given due consideration to the transcript of the hearing, the findings and recommendations of the hearing officer, and the brief submitted by counsel for Owens-Corning. He found that the company had violated chapter VI, section 2.1 of the Code and directed that it cease such violation on or before January 1, 1968 and forthwith take interim measures (set out at length) to minimize the effects resulting from its plant operations. Upon receipt of that order, Owens-Corning, acting pursuant to N.J.S.A. 26:2C-14.1, applied for a hearing as an aggrieved party. It also requested a stay of the order.
N.J.S.A. 26:2C-14.1 provides that any person aggrieved by an order of the Department may, upon application made within 15 days after notice of such order, be entitled to a hearing before the Department. Within 30 days after the hearing the Department shall issue an appropriate order modifying, approving or disapproving its prior order. Pending such determination, and upon application for a stay, the Department may stay the operation of its order upon such terms and conditions as it deems proper.
*374 Acting upon Owens-Corning's application, Commissioner Kandle fixed a hearing date, denied its request for a stay, and asked the company for particulars as to its claimed grievance. Owens-Corning replied by letter of April 25, 1967, alleging that the March 9 order was not supported by the record; it was improper since there existed no authority justifying the imposition of interim requirements; the order went beyond the terms of the statute and the Code; it failed to state the specific items found to be in violation; the order was unreasonable as to time and measures; it was vulnerable for vagueness and "impossibility," and was arbitrary, capricious and discriminatory.
The second (grievance) hearing was held on May 1, 1967. Owens-Corning objected to Mincher sitting as hearing officer, claiming that he was in effect sitting "on an appeal from your own order." The objection was overruled. Following the hearing, Commissioner Kandle issued an amended order on May 29, 1967, reciting that he had given due consideration to the transcript of the second hearing and the findings and recommendations of the hearing officer, as well as the brief submitted on behalf of Owens-Corning. He adopted the findings, conclusions and recommendations of the hearing officer, found that Owens-Corning had been aggrieved by the March 9 order, and that the order should be amended by extending the time within which the company was to comply with chapter VI of the Code from January 1 to April 1, 1968, and by deleting the paragraph of the prior order relating to stack heights. With the exception of these two amendments, the new order repeated the language of the March 9 order, including the specific interim measures the company was to take.

II
Owens-Corning owns and operates a plant in Barrington, Camden County, where it manufactures various fiberglas products. It uses four production lines, known as U-1, U-2, T and P-20, in its operations. The basic process on all *375 four lines is this: Raw materials are conveyed from a storage area and fed into a glass melting furnace. The material is then passed through a spinning operation which converts the molten glass into fiberglas, at which time a phenol formaldehyde resin is injected for binding purposes. The material is then cooled and conveyed into a curing oven after passing through several conveyors which control the thickness of the material. From the curing oven the material enters the fabricating stage where it is cut to size and packaged. The completed product is then sent to the warehousing area for shipment.
The issue to be determined at the first (preliminary) hearing was whether Owens-Corning had violated chapter VI, section 2.1 of the Code on the dates specified. The Department presented its case in two separate but related main phases. The first consisted of the testimony of 11 witnesses who lived close to or within a reasonable distance of the plant. They testified to the fumes, smoke and blue haze coming from the plant and to the effects they had suffered therefrom, demonstrating how, in various ways, their daily lives and property had been interfered with. Their complaints included a tearing and burning of the eyes, "runny" noses, a dry and "funny" taste in the mouth, nausea and coughing. The odor and smoke are unbearable. Almost all testified that they had to close their windows and stay indoors because of the conditions experienced.
The second phase of the Department's presentation involved technical evidence given by Joseph A. Rzigalinski, enforcement supervisor for the Department's air sanitation (pollution control) program. His qualifications as an air pollution expert were not challenged. He had visited the plant on a number of occasions and described the manufacturing process on the four production lines. Rzigalinski explained that two areas in particular generated gaseous emissions  the forming area and the curing area. He was present at the plant on February 17, 1966 at defendant's invitation, the purpose being to observe an odor tracer survey *376 of the emissions from the dehumidification tower stack. Dr. Amos Turk conducted the survey on behalf of Owens-Corning, and this was done when only the U-1 line and its odor abatement equipment were in operation, all other production lines being shut down. Dr. Turk's test was solely for the detection of phenol odors. Despite all precautions taken by the plant, he found low level peaks of phenol odors during the test.
Rzigalinski visited the plant on May 19, 1966, again at defendant's invitation, to observe tests of phenol odor emissions from the dehumidification tower stack on the U-1 line. The test, conducted for defendant by William R. Bradley Associates, indicated that 0.22 parts of phenol per million parts of air were being emitted from the stack. According to Rzigalinski, 0.22 ppm. is below the so-called "odor threshold level" for phenol of 0.29 ppm. None of the other production lines were tested for its emissions, nor was the test concerned with odors other than phenol. On this visit Rzigalinski detected strong formaldehyde odors from the binding room area, as well as odors coming from roof ventilators above the curing oven and from openings on the roof above the melting and spinning operations.
Although Rzigalinski's visits and the two surveys all predated the July and August 1966 complaint dates about which the Department's 11 witnesses testified, there is a definite correlation between the two evidential patterns. Samuel Thomas, Owens-Corning's Director of Environmental Control, admitted that the air pollution control equipment or devices at the plant were the same at the time he testified on January 9, 1967 as they had been for well over a year, except for a modification on the P-20 line in the fall of 1966. Moreover, there had been no substantial changes in the production process in that time except for some changes in chemicals or chemical processes in 1966. From this it may reasonably be said that conditions at the plant had not varied in any substantial degree as regards odor or smoke *377 emissions between the dates of Rzigalinski's inspections and the two surveys, and the dates set out in the complaint.
(It is appropriate to note at this point that the significance of the Turk and Bradley survey results and Rzigalinski's testimony lies in their having been adapted in the March 9, 1967 order.)
The record reveals that the Department had as early as May 1961, if not before, discussed with representatives of Owens-Corning the necessity of controlling emissions from its plant into the atmosphere. The company recognized the existence of the condition and was apparently trying to correct it. Numerous conferences and exchanges of correspondence followed over the next five years, all dealing with the air pollution problem. Although Owens-Corning repeatedly assured the Department that it was taking definite steps to eliminate the condition, it failed to comply with its own timetables as well as the Department's repeated requests that it control the emissions.
The Department's long and patient wait for Owens-Corning to solve the air pollution problem came to an end when it received a letter from company vice-president Briley on June 21, 1966. He wrote that the company was dissatisfied with the dehumidification tower on the U-1 line and accordingly did not intend to install similar equipment on the other three lines. Instead, Owens-Corning had directed its research center in Ohio to undertake a "crash" program at the Barrington plant. There would be a complete evaluation of these changes within the next six months, at which time the company would be in a position to know whether they were feasible. A timetable would then be developed to make the necessary process modifications as rapidly as possible. The Department filed its complaint soon after receipt of the Briley letter.
We take note of the reservation contained in Owens-Corning's brief that all that had taken place before between the company and the Department was not to be considered as any admission of violation on its part. This flies directly in *378 the face of the company's very clear knowledge that emissions from its plant had for years been polluting the air in Barrington and neighboring communities. This was made manifest in its conferences with Department representatives, in the letters it had written to the Department, and in its continued and protracted efforts to correct the situation.
Owens-Corning presented seven lay witnesses at the preliminary hearing. They denied they had ever experienced any of the complaints testified to by the 11 Department witnesses, or that the plant operations had ever interfered with their enjoyment of life and property. In evaluating the testimony of these witnesses it is to be observed that one lived next door to the company's purchasing agent Maguire; another admitted that her son dated his daughter; a third testified that the company had always been very cooperative in donating door prizes for local sports events of which he was chairman; a fourth lived around the corner from Maguire, and yet another witness was a friend of his.
Owens-Corning produced three expert witnesses, the testimony of only one of whom, Thomas, concerns us here. He said that environmental control in the type of plant defendant operates is an entirely new field. He gave a history of the various tests that had been made and the equipment that had been installed in order to alleviate the complained-of condition. The company had spent over $3,289,000 on this program.
At the conclusion of the preliminary hearing defendant sought and received permission to file a brief. Hearing Examiner Mincher then submitted his report of the hearing, together with his findings and recommendations. There followed the Commissioner's order of March 9, 1967 determining that defendant had violated the Code and ordering it to cease violation and take specified interim measures to minize the effects of its operations. Chief among these was that the company revise, remodel, repair or otherwise amend its U-2, T and P-20 production lines in such a way that before effluents therefrom were discharged into the atmosphere the *379 phenol odor reduction be equal or similar to, but no less efficient than, that accomplished by the system on the U-1 line at the time of the Bradley survey on May 19, 1966. Such revision, remodeling and repair was to include a baffled spray section, a wet scrubber of the packed tower type, and a demister or any other equipment, devices or processes necessary to reduce the phenol content of the effluent to a concentration not greater than 0.29 parts per million of air by volume at the point of discharge. The company was also to reduce phenol and formaldehyde odors emitted from the resin formulation room by such methods as might be necessary to reduce the phenol content of the effluent to at least 0.29 ppm. and the formaldehyde content to at least 0.25 ppm. Further, it was to reduce the odor content of the effluent from the louvered exhausts of the glass melting and fiberizing areas, from the general plant interior ventilation systems, from the storage, material handling and other ancillary operations, and from any and all other plant processes, operations and activities. That part of the order directing Owens-Corning to complete and submit to the Department on or before June 1, 1967 detailed studies and plans and specifications for increasing the height of stacks on all curing and forming processes, is the one heretofore mentioned as having been omitted from the subsequent amended order.
At the second hearing held pursuant to N.J.S.A. 26:2C-14.1 on defendant's application as a party aggrieved, Owens-Corning sought to introduce certain evidence in support of its position, claiming that the proposed proofs had a direct bearing on other conditions which could have produced the same complaints as were testified to by the Department's witnesses. The company offered to demonstrate, through Director Sullivan of the Division of Clean Air and Water, State Department of Health, and a report published by the committee of which he was chairman, that similar symptoms were caused by the exhaust fumes from motor vehicles. The hearing officer sustained plaintiff's objection to any such testimony by Sullivan or the introduction of the report. The *380 company next sought to establish the number of vehicles traveling within one mile of the plant, yearly and daily (average). This consisted of (1) a certificate from the New Jersey Turnpike Authority of the number of vehicles between Turnpike Exits 3 and 4 (the company's plant is fairly close to the Turnpike at this point) for the year 1965 and the first six months of 1966, and (2) an official map for Camden County, to be presented by the head of the Traffic Count Section of the Bureau of Highway Statistics, State Highway Department, showing the average daily total of vehicles for 1965. Objections to the introduction of these proofs were also sustained.
Following the close of the hearing and the hearing officer's report, findings and recommendations, Commissioner Kandle issued the amended order here under appeal.

III
During the pendency of the appeal Owens-Corning filed two motions. The first sought leave to present additional evidence dealing with the population (1960 census figures) of the three municipalities from which the Department drew its witnesses. In its brief opposing the motion the Department included the 1966 population estimates of the State Department of Conservation and Economic Development. We received both sets of figures without prejudice as to their materiality or relevance.
The second motion was addressed to the record filed by the Department with this court on August 14, 1967. The record included the report, findings and recommendations made by the hearing officer after the preliminary hearing as well as those made after the grievance hearing. Owens-Corning contended that it had never been given an opportunity to review the reports, findings and recommendations, and to respond to, explain or controvert them. It moved that the proceedings be remanded to the Department for a de novo hearing or, in the alternative, for an opportunity *381 to appear before the Commissioner to counter the hearing officer's reports. We denied the motion.

IV
Defendant contends that the Air Pollution Control Act, N.J.S.A. 26:2C-1 et seq., is unconstitutional because it delegates legislative power to an administrative agency, the Air Pollution Control Commission, without setting up a standard or standards to guide it in the exercise of that power.
The Commission was established by N.J.S.A. 26:2C-3. That section was repealed by L. 1967, c. 106, § 16, effective June 15, 1967. The Commission was abolished and all of its functions, powers and duties transferred to the Department of Health by section 2 of that act, now N.J.S.A. 26:2C-3.1. Section 3 (N.J.S.A. 26:2C-3.2) created a Clean Air Council in the Department, and section 4 (N.J.S.A. 26:2C-3.3) listed the Council's powers and duties.
Defendant does not contend that the Legislature may not, in the interest of the public health, enact legislation for the control of air pollution. Indeed, the safeguarding of the public health has long been considered an essential governmental function within the police power of the State. West Caldwell v. Caldwell, 26 N.J. 9, 30 (1958). The menace to the public health by air pollution is so much a matter of common experience as properly to be a subject of judicial notice. Board of Health, Weehawken Tp. v. New York Central R. Co., 4 N.J. 293, 299 (1950).
Until 1954 efforts to control air pollution in New Jersey proceeded as a local exercise of the state police power, under the public nuisance theory. Thus, in Garrett v. State, 49 N.J.L. 94 (Sup. Ct. 1886), it was indicated that the corruption of the air by noisome odors and smells, to the annoyance and inconvenience of the public, would constitute a public nuisance suppressible by the local board of health.
*382 The 1954 Legislature enacted the first state-wide legislation designed to attack air pollution on a comprehensive basis. L. 1954, c. 212, now N.J.S.A. 26:2C-1 et seq., the Air Pollution Control Act (1954). While no statement of general purpose accompanied this law, the Legislature did define "air pollution." The definition, found in N.J.S.A. 26:2C-2 and quoted earlier in this opinion, dealt with more than just the protection of the public health ("the presence in the outdoor atmosphere of substances in quantities which are injurious to human * * * life"  an embodiment of the earlier public nuisance theory). The Legislature went beyond that so as to encompass the promotion of the general public welfare with respect to air contamination which "unreasonably interfere[s] with the comfortable enjoyment of life and property throughout the State * * *." As a measure whose clear purpose is the protection of the public health and public welfare, the 1954 act is entitled to a liberal construction for the accomplishment of its obvious beneficent objective. 3 Sutherland, Statutory Construction, § 7203 (1943).
Additionally, there is a strong presumption in favor of the validity of the statute, and the burden of proving its unconstitutionality is "an extremely formidable one." Levitt & Sons, Inc. v. Division Against Discrimination, 31 N.J. 514, 531 (1960), appeal dismissed 363 U.S. 418, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960); N.J. Restaurant Ass'n v. Holderman, 24 N.J. 295, 300 (1957). As was said in Lane v. Holderman, 23 N.J. 304, 323 (1957), a statute "should be interpreted by a mind sympathetic to its aims which recognizes the difficulties inherent in formulating a precise expression of legislative intent in light of the diversity of circumstances to be covered."
When dealing with the question of standards, a court is not confined to the specific terms of the particular section in question, but must examine the entire act in the light of its surrounding and objectives. Standards may reasonably be implied from a consideration of the statutory *383 scheme as a whole. Ward v. Scott, 11 N.J. 117, 123 (1952); In re Berardi, 23 N.J. 485, 491 (1957).
A statute need establish no more than a sufficient basic standard, i.e., a definite policy and rule of action which will serve as a guide for the administrative agency, in order for the delegation of legislative power to be deemed valid. See N.J. Bell Tel. Co. v. Communications Workers, etc., 5 N.J. 354, 370 (1950). Our courts and the United States Supreme Court have frequently dealt with the question here presented, and they have sustained many statutes containing broad, general standards. See the N.J. Bell Tel. Co. case, at pages 371-372, and Como Farms, Inc. v. Foran, 6 N.J. Super. 306, 311-312 (App. Div. 1950), for a discussion of some of these decisions. In the latter case, Judge (now Justice) Jacobs discussed the rather general nature of the standard controlling the exercise of authority by the Director of Milk Control. What he said is particularly applicable here:
"* * * [A]lthough it [the Milk Control Act] is general in nature it is no more so than similar standards in other enactments approved by our state and federal courts. Thus the Board of Public Utility Commissioners has been guided simply by the standard of `public convenience and necessity' * * * and the Commissioner of Alcoholic Beverage Control with authority to fix prices and promulgate regulations * * * has been guided by the legislative pronouncement that the statute shall be administered in `such a manner as to promote temperance and eliminate the racketeer and bootlegger.' * * *" (at page 312)
He observed that standards such as "excessive profits," "just and reasonable," "fair return" and "unfair methods of competition" had been approved by the United States Supreme Court.
The Air Pollution Control Act of 1954 does not offend the requirement that there be sufficient standards for the guidance of the administrative agency. In its definitive sense, "air pollution" is in itself a standard, albeit a broad one. That aside, an entirely adequate standard appears in *384 the very definition of "air pollution" contained in N.J.S.A. 26:2C-2. By force of that definition, contamination of the air may be prohibited or controlled only under specifically defined circumstances, namely, where there is proof of injury to health or unreasonable interference with the comfortable enjoyment of life and property.
Our Supreme Court's description of the contents of the act in N.J. Dept. of Health v. Roselle, 34 N.J. 331 (1961), would militate against defendant's present contention:
"* * * The Commission and the Department are given wide powers to meet the pressing dangers of air pollution. The Commission is authorized to adopt a code or rules and regulations `controlling and prohibiting air pollution,' N.J.S.A. 26:2C-8. The Department is directed to `control air pollution in accordance with any code, rule or regulation promulgated by the commission,' with power to `(e) Receive or initiate complaints * * * and institute legal proceedings for the prevention of air pollution and for the recovery of penalties, in accordance with this act.' N.J.S.A. 26:2C-9.
The statute lays down the steps for enforcement of the code. * * * Thus the statute directs the Department to determine in plain terms what shall be done. * * *" (at pages 347-348)
Considering the nature and purpose of the Air Pollution Control Act, its need for flexibility, its standards when compared to those of other statutes that have been held valid, and its plainly sufficient procedural safeguards (e.g., N.J.S.A. 26:2C-8, 14, 14.1, 19 and 20), we conclude that the act does not lack adequate standards and that defendant has failed to sustain its burden in challenging the statute's constitutionality.

IV
Defendant next claims that section 2.1 of chapter VI of the Code is null and void because there is no statutory authority to adopt a "catch-all" provision. The argument made is that the Air Pollution Control Commission could not merely adopt a section of the act as a section of its Code, but was obliged to define with reasonable specificity *385 the conduct that would be considered a proscribed activity.
N.J.S.A. 26:2C-8 authorizes the Commission (now the State Department of Health) "to formulate and promulgate, amend and repeal codes and rules and regulations controlling and prohibiting air pollution throughout the State or in such territorities of the State as shall be affected thereby," provided a public hearing is first held. This broad power is, of course, controlled by the definition of "air pollution" contained in N.J.S.A. 26:2C-2 and section 1.10 in chapter I of the Code.
Owens-Corning makes no claim that chapter VI was not properly adopted by the Commission after a public hearing. Its contention is that neither the Code nor the statute is in the slightest degree informative as to what a manufacturer may or may not emit into the atmosphere, and in what quantities. We find a sufficient guide and standard provided in the definition section of the act and Code. Additionally, a defendant has the benefit of adequate procedural safeguards. It has been said that standards are not as important as are procedural safeguards and outside checks upon discretionary power. 1 Davis, Administrative Law, §§ 2.08-2.15 (1958), cited with approval in Gilman v. Newark, 73 N.J. Super, 562, 596 (Law Div. 1962).
Such procedural safeguards are not lacking here. Not only are the courts ultimately available to an aggrieved defendant in the event of procedural unfairness  N.J.S.A. 26:2C-20 provides for review of the validity of any code, rule or regulation promulgated by the Commission by a proceeding in lieu of prerogative writs  but there are additional procedural safeguards provided by the act itself.
In the first place, where a code does not set specific limits for emissions to the atmosphere, as here, no order to cease such emissions may be issued until a preliminary hearing has been held. This provision was written into N.J.S.A. 26:2C-14 by L. 1962, c. 215, § 6. The obvious legislative goal was flexibility in an area where complete cataloging of *386 all possible substances and their harmful densities and effects would be impossible. Instead, the Department was authorized to hold a preliminary hearing for the purpose of determining whether a defendant had violated the Code. The inquiry at the preliminary hearing is entirely factual. Its purpose is to determine whether defendant has caused the presence in the atmosphere of substances in quantities injurious to health or property, or in quantities which unreasonably interfere with the comfortable enjoyment of life and property. If it is determined, as it was in this case, that defendant has caused one or both of these kinds of air pollution, the Department is authorized to order that the violation cease.
L. 1962, c. 215, § 6, which substantially tightened the enforcement machinery, supplemented the original act of 1954 by providing, in section 9 (now N.J.S.A. 26:2C-14.1), as heretofore noted, that any person aggrieved by an order of the Department under the act may, upon application made within 15 days after notice therof, be entitled to a hearing before the Department. The Department must, within 30 days after such hearing, issue an appropriate order modifying, approving or disapproving its prior order.
Owens-Corning had the full benefit of not only a preliminary hearing but a hearing on its grievances as well. And presently it is seeking review of the original order and amended order, as permitted by N.J.S.A. 26:2C-20 and R.R. 4:88-8.
Defendant asserts that although it has been recognized in New Jersey that there is no rigid principle requiring an administrative agency to lay down rules and standards spelling out every grant of authority received, it has nonetheless been recognized that there are certain instances where rules must be promulgated prior to a finding of violation, citing Boller Beverages, Inc. v. Davis, 38 N.J. 138 (1962). That case is clearly distinguishable on its facts. The Director of the Division of Alcoholic Beverages was authorized by statute to enact rules and regulations necessary to regulate and control *387 the manufacture, sale and distribution of alcoholic beverages. Although he had not adopted a rule pertaining to containers, he specially ruled, without a hearing, that the sale of a brand of corn whiskey was illegal in New Jersey when packaged in Mason or fruit jars. The court held that the Director's ruling amounted to ad hoc legislation: no opportunity for a hearing had been afforded Boller Beverages whose packaging was determined to be illegal. Nor had the Director referred to any specific provision of the Alcoholic Beverage Control Act, N.J.S.A. 33:1-1 et seq., or to any rule or regulation promulgated under his rule-making power in advance of the ruling under attack, prohibiting the particular type of packaging used by Boller Beverages. Such is not the case here. Owens-Corning's alleged violation of the Code was fully exposed and explored in the preliminary hearing and, after it had claimed to have been aggrieved, at the second hearing. Only then did the amended order issue.
There was, therefore, no lack of a hearing in this case and, more importantly, no ad hoc legislation involved. A factual determination, made after full hearing, that Owens-Corning was guilty of polluting the air, cannot be characterized as ad hoc.
We find nothing in R.H. Macy & Co. v. Director of the Division of Taxation, 77 N.J. Super. 155, 180 (App. Div. 1962), affirmed 41 N.J. 3 (1963), cited by defendant, to support its attack upon the Code or the act.
There is a plain answer to defendant's claim that the Code lacked specificity in that it failed to inform it with particularity as to the nature of its offending activity. The activity was and remains air pollution. In view of the extended conferences and correspondence detailed in the record, the company's efforts to achieve at least a degree of control over the emissions from its plant into the atmosphere, and finally the Briley letter of June 21, 1966, defendant cannot seriously contend that it was not sufficiently informed for more than half a dozen years of the conduct proscribed by the Code.
*388 We therefore conclude that Owens-Corning's attack upon the validity of section 2.1 of chapter VI of the Code is without merit.

V
Defendant next contends that it was denied due process by the entry of the order and amended order from which it appeals. This claim is based on the "secret report" doctrine of Mazza v. Cavicchia, 15 N.J. 498 (1954), which held that when a Division of Alcoholic Beverage Control hearing officer transmits a report of the hearing held before him to the Director, who then issues an order based thereon, due process is denied if that report is not first submitted to the defendant licensee so that he may refute it before the Director acts. Owens-Corning's claim here is that just such a secret report was transmitted to the State Commissioner of Health, and that its constitutional rights were thereby violated.
There are at least two answers which defeat this claim. The first is that the point was raised and decided against defendant in its motion for a remand for a de novo hearing. That motion (M-10-67) was accompanied by extensive briefs filed before a Part of this court which sat in the late summer of 1967, and it was denied. Owens-Corning's right to reargue the question was not reserved. We therefore consider that the company is concluded by our determination.
The second and substantive answer is that Mazza does not apply because of the very nature of the hearings held in the instant case. In Mazza, as already indicated, there was a hearing, the hearing officer filed his report, and the Director then issued his order without affording the licensee an opportunity to inspect the report and file exceptions. In the present case there was a preliminary hearing by reason of the provisions of the third paragraph of N.J.S.A. 26:2C-14. After taking extensive testimony and analyzing the record, the preliminary hearing officer transmitted his report to the State Commissioner of Health, who then rendered his *389 findings, conclusions and order. What followed distinguishes this case from Mazza, for defendant requested a hearing as a person aggrieved, under N.J.S.A. 26:2C-14.1. This new hearing was plenary in nature. It was not an appeal, as defendant incorrectly characterizes it. Indeed, the statute does not designate this hearing as an "appeal," and the nature of the hearing belies the characterization.
The hearing called for by N.J.S.A. 26:2C-14.1 does two things: (1) It permits a defendant to set out in just what manner he considers himself aggrieved. In other words, he excepts to the preliminary report. This is precisely what Owens-Corning did in response to the Commissioner's invitation that the company state the particulars of its claimed grievance. (2) It affords full opportunity for a defendant to prove its grievances and to meet the findings and conclusions of the original report.
Before issuing the amended order the Commissioner, as recited in the body of that order, gave due consideration to the transcript of the second hearing, the findings and recommendations of the hearing officer, and also the brief submitted on defendant's behalf. The amended order followed the original order, except for giving Owens-Corning three months more to comply and deleting the stack height provision that had been included among the interim directives of the original order.
It is entirely clear that defendant's views were made known to the Commissioner and considered by him before entry of the amended order, and this after a plenary grievance hearing. We find no denial of due process or fundamental unfairness in this case.
As for defendant's claim that it was improper for the same hearing officer to preside over the preliminary and second hearings, that contention is based on the invalid argument that the later hearing was in the nature of an appeal from the original order. We find the claim baseless since the second hearing was not an appeal as such.

*390 VI
Defendant argues that both the original and the amended orders are void for failure to state the "items which are in violation," as required by N.J.S.A. 26:2C-14. This contention fails to recognize, however, that the quoted language refers to an order of the ex parte type issued under the second paragraph of that section  one issued without the holding of a preliminary hearing. The original order was issued under the third paragraph of N.J.S.A. 26:2C-14, and not the second. The terms of the third paragraph do not require a statement of "items which are in violation." Nor does N.J.S.A. 26:2C-14.1, under which the amended order issued.

VII
Owens-Corning next claims that the Commissioner does not have the authority to prescribe interim measures to alleviate the violation. Interim measures were implicitly approved in Shahmoon Industries, Inc. v. Department of Health, 93 N.J. Super. 272, 284 (App. Div. 1966), certification denied 49 N.J. 358 (1967).
Defendant's position is lacking in logic. Had the Commissioner's final order merely directed that violation of chapter VI, section 2.1 of the Code cease on or before April 1, 1968, defendant undoubtedly would have complained that the order was too vague. (Compare its claim under VIII below). It now claims, in effect, that the order is too specific because it directs what measures should be taken to alleviate the pollution condition. It would appear to us that the ordering of interim measures is to defendant's advantage, particularly in view of the fact that the Commissioner could have ordered the company to close down its plant completely in order to bring the air pollution to an end. See N.J. Dept. of Health v. Roselle, above, 34 N.J., at page 348.
What is entirely lacking here is a showing as to just how defendant was prejudiced by the order in question.

*391 VIII
It is next asserted that the orders under review are too vague for enforcement because they fail to state what Owens-Corning did that was in violation of chapter VI, section 2.1 of the Code, citing the Roselle case in support of the argument. That case is distinguishable. See Shahmoon Industries, Inc. v. Department of Health, above, at pages 284-285. The court in Roselle held that an injunctive order to "cease violating" the Code which, in turn, directed that "No person shall cause, suffer, allow or permit open burning of refuse," was too broad. The order was deemed insufficiently informative in the context of repeated fires on appellant's garbage dumps of apparently spontaneous or otherwise mysterious origin. Here, as was said in Shahmoon, Owens-Corning certainly knows the nature and origin of its violation of the Code; otherwise its efforts to alleviate the air pollution condition at its Barrington plant would be without purpose and meaningless.

IX
We have also considered defendant's argument that the orders were improper in that they attempted to regulate odors, since this is not a subject properly within the scope of the enabling legislation or the Code, both of which speak of "substances." (As noted in footnote 1, above, the act, as amended by L. 1967, c. 106, § 5, now speaks of "air contaminants" instead of "substances.") Defendant relies upon Verona v. Shalit, 92 N.J. Super. 65 (1966), a County Court case where it was said that the Code "does not contain any prohibition against odors." On appeal, however, the Appellate Division expressly refrained from dealing with this issue, resting its affirmance on other grounds. See Verona v. Shalit, 96 N.J. Super. 20, 25 (1967). In any event, we consider defendant's conclusion a mistaken one.
In the first place, the County Court decision itself refutes defendant's claim when it says that the "substances" prohibited *392 from being emitted by the Code "may include smoke, flying ash, air contaminants, consisting of `coarse and fine solid particles, liquid particles, vapors or gases which are discharged into the outdoor atmosphere,'" (at page 68; italics ours).
An odor is a substance of gaseous character or a liquid of high vaporizing quality. The odor of perfume, for example, is an emission of vapor into the air, caused by evaporation of the liquid vehicle carrying the odoriferous element. The familiar odor of rotten eggs is the gas hydrogen sulphide. The odor of formaldehyde or acetone is the air-borne vapor of these chemicals. All are clearly "substances" within the definition of the word. Thus, in prohibiting emission of noxious substances the obvious legislative purpose was to include odors. Defendant would hardly contend that the Legislature did not intend to prohibit the release into the air of high concentrations of the odor of chlorine or hydrogen cyanide, both of them deadly gases. Furthermore, odors may amount to a nuisance if produced in unreasonable quantities, and their production could therefore be proscribed under the act.
Under the new definition of "air pollution" contained in the 1967 amendment, an odor is clearly an "air contaminant." By this amendment the Legislature made explicit what it meant by "substances."

X
Defendant next argues that the record does not support the Commissioner's conclusion that there was a violation of the Code. Specifically, it asserts that the Department failed to prove any interference with the comfortable enjoyment of life and property, and, assuming interference was shown, it was not proved to be unreasonable under N.J.S.A. 26:2C-2. In essence, this amounts to a claim that the administrative determination was not based upon sufficient credible evidence.
*393 In proceedings before an administrative agency, it is only necessary to establish the truth of the charges by a preponderance of the believable evidence, and on appeal the factual determinations of the agency are generally sustained "if they are supported by substantial evidence on the whole record." Atkinson v. Parsekian, 37 N.J. 143, 149 (1962). Our review of the record, summarized earlier in this opinion, convinces us that this test has been met.

XI
It is claimed that the hearing officer improperly excluded defendant's offer of proof that other sources  specifically, the exhaust from motor vehicles  were responsible for the complaints registered by the Department's witnesses. The hearing officer found the proffered evidence "too remote" to be relevant on the issue of defendant's pollution of the atmosphere. We cannot say this was error, even under rules of evidence which need not be strictly enforced in a Department hearing held under the Air Pollution Control Act. See N.J.S.A. 26:2C-16. As we said in D'Amico v. Blanck, 85 N.J. Super 297, 303 (1964), certification denied 43 N.J. 448 (1964), "the choice of accepting or rejecting the testimony of witnesses rests with the administrative agency, and where such choice is reasonably made, it is conclusive on appeal." Absent a showing that the exclusion of the proffered evidence was inconsistent with substantial justice, we will not disturb the administrative determination. R.R. 1:5-3(b). Defendant has not made such a showing.

XII
Defendant's final argument is that the doctrine of "unavoidable necessity" dictates that the Commissioner's order may not be sustained.
As the State correctly points out, the applicability of the doctrine turns upon the reasonableness of the statute or regulation under review and of the proscription imposed. *394 Assuredly, it is not unreasonable for the State, in the interest of the public health and welfare, to seek to control air pollution. Even if this means the shutting down of an operation harmful to health or unreasonably interfering with life or property, the statute must prevail. But no such drastic measure was called for in this case.
Upon analysis, defendant's argument based on "unavoidable necessity" is that since no known equipment exists which could solve the situation, no unreasonable interference with the comfortable enjoyment of life or property can be asserted against it. The record does not support that claim. The best that can be said is that no method yet found and used by Owens-Corning is totally effective. However, steps that will substantially improve the air pollution condition are available. The proofs are that when Owens-Corning used certain equipment on its U-1 line, there was a diminution of pollution. The company, as shown by the Briley letter of June 21, 1966, is not entirely satisfied with the result achieved on the U-1 line and does not intend to install similar equipment on its other lines. It represents that it is presently engaged in a crash research program to develop major changes in its basic manufacturing processes. Two very promising changes have already been developed and are being tested.
The Commissioner has ordered that certain steps be taken which he considers will curb the too-noxious emissions from the Barrington plant. Defendant must, for the moment, comply with the order. If the steps prescribed do not wholly accomplish the desired result, other or supplemental steps may be taken. In short, the situation is subject to the continuing jurisdiction of the Department. We hold that the doctrine of unavoidable necessity is not available to defendant and is not viable in the context of the Air Pollution Code.
The amended order is accordingly affirmed in all respects.
NOTES
[1] Effective June 15, 1967 this section of the Code was amended by L. 1967, c. 106, § 5 to read:

"`Air pollution' as used in this act shall mean the presence in the outdoor atmosphere of one or more air contaminants in such quantities and duration as are, or tend to be, injurious to human health or welfare, animal or plant life or property, or would unreasonably interfere with the enjoyment of life or property throughout the State and in such territories of the State as shall be affected thereby and excludes all aspects of employer-employee relationship as to health and safety hazards."