[Civil No. 3616.   Filed March 27, 1935.]

[42 Pac. (2d) 619.]

BOARD OF REGENTS OF THE UNIVERSITY OF ARIZONA, Plaintiff, v. JOHN L. SULLIVAN, as Attorney General of the State of Arizona, Defendant.

Messrs. Strouss & Salmon, for Plaintiff.

Mr. John L. Sullivan, Attorney General, and Mr. Dudley W. Windes, Assistant Attorney General, for Defendant.

ROSS, J.—This is an original proceeding by the Board of Regents of the University of Arizona, hereinafter called plaintiff, asking for a writ of *mandamus* directing John L. Sullivan, as Attorney General of the State of Arizona, hereinafter called defendant, to do and perform certain acts, hereinafter more specifically set forth. Alternative writ issued, to which the Attorney General has made answer, and the matter is before us for determination.

The Third Special Session of the Eleventh Legislature passed the "Educational Institutions Act of 1934" (being chapter 7 of said session), to which

we shall hereafter refer as the act, for the purpose of enabling plaintiff, Board of Regents of the University of Arizona, to issue and sell its bonds to "any federal agency" to secure money to improve and enlarge its educational plant, and to accept grants from any such agency.

In pursuance of the terms of said act and the National Recovery Act of June 16, 1933 (48 Stat. 195), the plaintiff applied to the Federal Emergency Administrator of Public Works for a loan of $623,-000, to be secured by its interest-bearing bonds, and for an outright gift or grant of $192,000, or a total of $815,000, which application has been duly approved by the said Federal Administrator.

On February 28th, 1935, the plaintiff, at a meeting duly and regularly called, by resolution authorized the issuance of its bonds in the sum of $623,000 to be sold to the said Federal Administrator, and the pledging of the revenues of said plant as improved and enlarged to secure the payment of such bonds.

The plaintiff submitted such bonds and all proceedings in connection therewith to the Attorney General of the state for examination and approval, whereupon it became his mandatory duty, under section 10 of the act, to examine into and pass upon the validity of such bonds and the legality of all proceedings in connection therewith, and, if such bonds were in fact and in law in conformity with the Constitution and laws of the state, and binding, legal and valid obligations enforceable according to the terms thereof, to certify, in substance, upon the back of each of said bonds that it is issued in accordance with the Constitution and laws of the state of Arizona.

The Attorney General refused to so certify, although in his answer he admits the bonds were issued in all respects in conformity with the Constitution and laws of the state, and particularly in accordance

with the Educational Institutions Act of 1934. His sole reason for refusing to approve and certify such bonds is upon the ground that the law authorizing them is unconstitutional, because:

(a) Such act is not related to the subjects specified within the call for such special session, in contravention to section 3, part 2, article 4, of the Constitution of Arizona, reading as follows:

" . . . The Governor may call a special session, whenever in his judgment it is advisable. In calling such special session, the Governor shall specify the subject to be considered at such session, and at such session no laws shall be enacted except such as relate to the subjects mentioned in such call."

(b) Said act contravenes section 13, part 2, article 4, of the Constitution, in that it (1) embodies more than one subject, and (2) the title does not express the subject of the act, and the body of the act is not germane to the subject. Such section 13 reads as follows:

"Every Act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be embraced in the title."

(c) Such act authorizes the creation of a debt against the state in excess of the constitutional amount as provided in section 5, article 9, reading:

"The State may contract debts to supply the casual deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by virtue of one or more laws, or at different periods of time, shall never exceed the sum of three hundred and fifty thousand dollars. . . ."

(d) Such act authorizes the development of educational institutions by fees and charges in contravention of section 10, article 11, reading as follows:

"The revenue for the maintenance of the respective State educational institutions shall be derived from the investment of the proceeds of the sale, and from the rental of such lands as have been set aside by the Enabling Act approved June 20, 1910, or other legislative enactment of the United States, for the use and benefit of the respective State educational institutions. In addition to such income the Legislature shall make such appropriations, to be met by taxation, as shall insure the proper maintenance of all State educational institutions, and shall make such special appropriations as shall provide for their development and improvement."

And (e) said act violates the provisions of section 6, article 11, reading as follows:

"The University and all other State educational institutions shall be open to students of both sexes, and the instruction furnished shall be as nearly free as possible."

■■ The courts do not lightly declare legislative acts unconstitutional. If in doubt, they will uphold legislation. This disposition is on account of the respect due to the action of a co-ordinate branch of the government while functioning in its allotted sphere. One who charges the legislature with transgressing the fundamental law has the burden of establishing the charge, as we and many of the courts have said, beyond a reasonable doubt. So, we approach the grave questions raised by the Attorney General with this rule in mind. We consider them in the order above stated.

■ (a) The Educational Institutions Act of 1934 was not passed at a regular session of the legislature, but at a called or special session. When the legislature is convened at the instance of the Gover-

nor, it is required by the Constitution (section 3, pt. 2, art. 4) that he state in his call the specific subject he desires the legislature to consider; and any legislation enacted by that body must relate to such subject. One of the subjects mentioned in the Governor's call is described as follows:

"To enable the Board of Regents of the University of Arizona . . . to borrow money or accept grants from any Federal Agency."

This amounts to a commission to the legislature to pass any and all legislation necessary to endow the University with power to borrow money and accept grants from the federal government or any of its agencies. But it is said the provision in section 2 of the act, creating plaintiff a corporation, is not related to the subject of the call. So far as the plaintiff is concerned, the act did not create it a corporation; it was already, and for a long time had been, a corporation. Section 1132, Revised Code of 1928; paragraph 4475, Revised Statutes of 1913, Civil Code; paragraph 3630, Revised Statutes of 1901, Civil Code; paragraph 2491, Revised Statutes of 1887, Civil Code; paragraph 1284, Revised Statutes of 1877. The act gives plaintiff some additional powers, such as the right "to acquire any project or projects, and to own, operate and maintain such project"; "to accept grants . . . from a federal agency"; "to borrow money and issue bonds," etc.; and "to perform all acts and do all things necessary . . . to obtain loans or grants or both from any federal agency." In other words, these additional powers were conferred for the purpose of qualifying plaintiff to borrow money and accept grants from a federal agency, all relating to the subject of the call.

To secure the payment of the bonds to be sold to the federal agency, section 5 of the act provides that the board of regents is empowered to fix and main-

tain fees, rentals and other charges, etc., for the use of plaintiff's plant and facilities, and to pledge such income to the payment of bonds and interest. This, it is claimed, does not relate to the subject of the call. Certainly the means and ability to pay the bonds are necessary qualifications to enable the plaintiff "to borrow money . . . from any Federal agency."

The rule concerning the power of the legislature under a special call is very liberal, and is stated by Lewis' Sutherland's Statutory Construction, second edition, 111, section 65, as follows:

"The legislature may act freely within the call; may legislate upon all or any of the subjects specified, or upon any part of a subject; and every presumption will be made in favor of the regularity."

The rule as stated in 59 Corpus Juris 526, section 20, is:

"The Governor's call or message need not state the details of the legislation to be considered, as such matters are within the discretion of the legislature and beyond the control of the governor except for his power of veto. Where a general object is described, the legislature is free to determine in what manner such object shall be carried into effect."

(b) It is next contended that the constitutional requirement (section 13, pt. 2, art. 4), that the subject of every act shall be expressed in its title, and the contents of the act confined to such subject and matters properly connected therewith, is violated by the act, in that (1) the act embraces more than one subject; (2) the title does not express the subject; and (3) the body of the act is not germane to the subject. The title of the act reads as follows:

"An Act to constitute and confirm certain educational institutions of the state as separate legal entities; to confer powers upon such educational institutions, including the powers to purchase, construct,

better, and equip buildings and to make other improvements to their plants, and for such purposes to borrow money and accept grants from any federal agency; to issue bonds and limit the amounts thereof and to provide for the payment of such bonds and interest thereon and to secure such payment; to confer further powers for the making of agreements with the holders of such bonds; to limit the time within which bonds may be issued; to supersede inconsistent provisions of all other laws; and to declare an emergency.''

When the act is read and analyzed it will be seen that it has but one general subject, to wit, the enablement of the plaintiff and the other educational institutions of the state named therein to borrow money and accept grants from the United States, and to secure the ultimate return to the United States of its loan, with interest, by a pledge of the income of such borrowing institution. That outstanding subject is expressed in the title, but in both the title and the body of the act many matters are mentioned and treated because they are properly connected with such subject and are essential to the accomplishment of the main object of the act.

We have held that the ''one subject'' provision of said section 13 will be given a liberal construction, and not a strained and narrow construction for the purpose of nullifying legislation. *In re Miller*, 29 Ariz. 582, 244 Pac. 376; *Board of Control* v. *Buckstegge*, 18 Ariz. 277, 158 Pac. 837; *Black & White Taxicab Co.* v. *Standard Oil Co.*, 25 Ariz. 381, 218 Pac. 139. The true rule seems to be that any provision of an act directly or indirectly relating to the subject expressed in the title, and having a natural connection therewith, and not foreign thereto, should be held to be embraced within it. *Hancock* v. *State*, 31 Ariz. 389, 254 Pac. 225; *State* v. *Davey*, 27 Ariz. 254, 232 Pac. 884. What we said concerning

these same contentions by the Attorney General in *Maricopa County Municipal Water Conservation District Number One* v. *La Prade, ante,* p. 61, 40 Pac. (2d) 94, is especially applicable to this question, as also the preceding one.

Granting that the main object of the act is as stated above, matters properly connected therewith would be the power to borrow money and accept grants from any federal agency; to improve the institution's plant by the erection of other necessary buildings and improvements and their equipment; also the power to issue bonds and provide for their payment.

(c) If the proposed bond issue of $623,000 becomes a debt of the state, it will make the state's indebtedness exceed the constitutional limitation of $350,000, which may not be legally done except to repel invasion, suppress insurrection, or defend the state in time of war. Section 5, art. 9. If such bond issue becomes and is the debt of the institution that emits it, and the state in no way becomes liable for its payment, it will not contravene such section. While the act, in terms, incorporates these institutions and clothes them with certain corporate powers, the question arises as to whether this may be done, and, if so, in the manner pursued. There are certain kinds of corporations which under the Constitution cannot be created by special act. They are "Municipal Corporations" (art. 13) and "Corporations Other Than Municipal" (art. 14). That these educational institutions are not of the first kind goes without saying, nor do they fall within the latter kind. Section 1, article 14, defines "corporations other than municipal" as follows:

"The term 'corporation,' as used in this Article, shall be construed to include associations and joint stock companies having any powers or privileges of

corporations not possessed by individuals or co-partnerships. . . . ''

We do not need to argue that public officials, or state institutions governed and controlled by public officials, are not associations or joint stock companies. *People* v. *Dunn,* 255 Ill. 289, 99 N. E. 577. These educational institutions and their governing bodies do not belong to either of the classes of corporations recognized in articles 13 and 14 of the Constitution, and the prohibitions therein against the creation of corporations by special act do not apply to these institutions.

The provisions of the act conferring upon the plaintiff certain corporate powers and privileges impinges no constitutional rule, as we see it.

''That the legislature is vested with the whole of the legislative power of the state and that it has authority to deal with any subject within the scope of civil government, except in so far as it is restrained by the provisions of the constitution, and that it is the sole tribunal to determine as well the expediency as the details of all legislation within its power, are principles so familiar as hardly to need mention.'' *In re Madera Irr. Dist.,* 92 Cal. 296, 28 Pac. 272, 273, 675, 27 Am. St. Rep. 106, 14 L. R. A. 755.

See, also, 14 C. J. 94, § 56.

Certain of our institutions of higher education were such before Arizona became a state, and these were recognized by the Constitution as a part ''of a general and uniform public school system,'' for the establishment and maintenance of which the legislature was directed to enact laws. Section 1, art. 11. The government of these institutions is conferred on certain elected and appointed officials (section 2, Id.), whose ''powers and duties . . . shall be such as may be prescribed by law'' (section 3, Id.). These constitutional provisions not only authorize but require

special legislation for the maintenance and government of these pre-existing state institutions. They were made by the Constitution objects for the special care and consideration of the legislature. As was said of a similar situation, in *State* v. *Regents of University,* 55 Kan. 389, 40 Pac. 656, 657, 29 L. R. A. 378:

"The legislation must be special, because but one university is contemplated. It is claimed that section 1, art. 12, of the Constitution, which treats of corporations, and provides that 'the legislature shall pass no special act conferring corporate powers,' would render void a special act conferring corporate powers on the university, and that the legislation with reference to the university can only be upheld on the ground that it is a quasi corporation, and not a corporation proper. It is conceded by the very learned counsel for the defendant that universities are generally corporations proper, but it is claimed that our state university, while a valid public institution, cannot be a valid corporation because of section 1, article 12. We think this section has no application to legislation with reference to the university. It is in the article which treats of corporations in general. The section of the constitution first quoted, however, is in the article treating of the subject of education, and applies specifically to the establishment of a university. It directs the establishment of such an institution, leaving the legislature free in determining as to particulars. It is true that there is no express grant of authority to make it a corporation, but in view of the fact that such institutions are generally corporations, and of the difficulty, if not utter impracticability, of establishing a school authorized to receive donations, and to hold extensive properties intended for the use of each succeeding generation, without conferring corporate powers, we think it clear that the framers of the constitution meant to and did authorize the establishment of the university as a corporate body."

The special mandate to the legislature to enact laws for these educational institutions is rather con-

.vincing that it was not intended that the legislature should be restricted to the passing of general laws for the incorporation of such institutions, but that it might, as it did, incorporate the same by special act.

Section 2, article 11 of the Constitution provides that:

"The general conduct and supervision of the public school system [consisting of kindergarten, common, high, normal and industrial schools and a university] shall be vested in a State Board of Education, a State Superintendent of Public Instruction, county school superintendent, and such governing boards for the State institutions as may be provided by law."

At the time of the adoption of the Constitution, and for a long time prior thereto, ever since, and now, the governing board of the University was a board of regents appointed by the Governor of the territory and state, of which board the Governor is *ex officio* a member; of the two normals (now teacher's colleges), two citizen members appointed by the Governor and the superintendent of public instruction, who is *ex officio* a member. The act recognizes and confirms the constitutional agency of the governing boards of these institutions, and constitutes them separate and independent legal entities and governmental instrumentalities to disseminate knowledge and learning, and confers upon them the power, among others, to accept grants and borrow money from a federal agency on bond issues, and to provide for the payment thereof.

The particular provisions of the act bearing upon and pertinent to the question as to whose indebtedness the $623,000 bond issue is are found in sections 8 and 9 thereof, reading as follows:

"Section 8. *Prohibitions against obligating State of Arizona.* Nothing in this Act contained shall be

construed to authorize any institution to contract a debt on behalf of, or in any way to obligate, the State of Arizona, or to pledge, assign or encumber in any way, or to permit the pledging, assigning or encumbering in any way of appropriations made by the Legislature, or revenue derived from the investment of the proceeds of the sale, and from the rental of such lands as have been set aside by the Enabling Act approved June 20, 1910, or other legislative enactments of the United States, for the use and benefit of the respective state educational institutions.''

''Section 9. *Bonds obligations of Institutions.* All bonds issued pursuant to this Act shall be obligations of the institution issuing such bonds payable only in accordance with the terms thereof and shall not be obligations general, special or otherwise of the State of Arizona. Such bonds shall not constitute a debt, legal or moral, of the State of Arizona, and shall not be enforceable against the State, nor shall payment thereof be enforceable out of any funds of the institution issuing said bonds other than the income and revenues pledged and assigned to, or in trust for the benefit of, the holder or holders of such bonds.''

Section 5 of the act provides that the bonds and interest thereon shall be paid out of the income of the borrowing institution and such income is pledged to that end. Notwithstanding the plain declaration of the act, that the indebtedness incurred by the bond issue is that of the borrowing institution and payable only out of the institution's income from fees, rentals, etc., the contention may be made that it is the state's indebtedness, because, after all is said, the debt is to be paid out of the income from the state's property. The question suggested is new here, but has been frequently before the courts of other jurisdictions, and has been variously determined. Three rules have resulted which are, together with the cases supporting them, stated by the court in *State* v. *City of Miami,* 113 Fla. 280, 152 So.

6, 9. The cases cited are so numerous they seem exhaustive of the subject. We give the rules as stated by that court, omitting the cases:

"There is respectable authority (perhaps the weight of authority is to this effect) which affirms the proposition that municipal obligations, which are not payable from taxes, but are provided to be payable solely from the revenues of an independent revenue producing asset or utility, do not constitute a debt of the municipality, within the prohibition of a constitutional or statutory debt limit. [Citing cases.]

"Other cases limit the doctrine to those obligations only which do not undertake to pledge any of the existing revenues of a plant or other revenue producing assets *in esse,* while some of the cases held [hold] that the foregoing distinction is not applicable to obligations for extensions and additions, when made payable from the gross income of the enlarged plant or other revenue producing asset of the municipality. [Citing cases.]

"A third group of cases refuses to acknowledge any such distinction at all. The last-mentioned group holds that, to permit a city to borrow any money under a contractual device for its repayment with interest, even though it is expressly provided therein that the municipality shall not be liable generally for its repayment, but that the lender shall look solely to pledged municipal property or assets, or the income thereof, as security, in effect annuls the intended constitutional, or statutory, restriction of municipal improvidence, and is therefore void as an indirect attempt to strike down an intended safeguard against municipal profligacy. These cases regard any form of revenue anticipation borrowing as an unlawful attempt to circumvent the debt or borrowing restrictions of the statute or constitution, which are to be regarded as intended for the purpose of forbidding imposition of additional burdens on the taxpayer, either by diverting funds which must be replenished by other funds raised by taxation if so used, or otherwise made up out of moneys which

would be available for reducing taxation if not diverted. [Citing cases.]''

Under the act, the gross income of the plant after additions and extensions is pledged to the payment of the bond issue, and therefore the facts bring the case within either of the first two rules, making the bonds the debt of the institution. The third rule is the minority rule.

We are of course at liberty to adopt any one of the rules stated, or we may formulate a rule of our own if none of those approved by text-writers and other courts appears to us sound, or we may, if we so choose, reject the majority rule and adopt the minority rule. By adopting the majority rule, however, we sustain the legislature's power to enact the law in question. It may be conceded that the majority rule is not always right, but under the law of averages it is more apt to be than the minority rule. At least, if the questioned legislation is sustained by the majority rule, it should raise a reasonable doubt of its unconstitutionality and cause us to hesitate to strike it down.

The bonds are not payable from taxes, but solely from the revenues of the University; they do not constitute a debt, direct or contingent, within the constitutional prohibition limiting the state's indebtedness. The arrangement under the act is that the bonds and interest shall be the debt of the University and shall be paid out of the revenues of the University, and that the state shall never in any event be liable therefor. It appears that the University's yearly income will be $180,000, whereas only $40,000 on the average, over a period of twenty-seven years, will be necessary to meet its obligations under the proposed bond issue. If it be suggested that the income of the institution is now, and has been, applied towards maintenance and that future legislatures will be called upon to increase appropriations in an

amount equal to such income, we answer such suggestion by quoting from *State* v. *Regents of University System of Georgia,* (Ga. Sup.) 175 S. E. 567, 573, as follows:

"If the proposed bonds here under consideration would create a debt at all, it would be a debt against a corporation governed by the Board of Regents, and not against the state. This conclusion is not based upon the terms and conditions of the particular contract. Regardless of the stipulations made, the state of Georgia could never be called upon to pay these bonds, nor would it be under any obligation, moral or otherwise, to levy any tax for the purpose of repairing any loss that might result to the university in consequence of these transactions, if the action of the board should ultimately prove to be unwise and a loss should result. If the payment of any of these bonds from the income as pledged should by any chance cause such a drain upon the resources of the affected institution that it might be in need of increased appropriations in order to function properly as an educational unit, the state would still be under no obligation to supply the deficit, even though it might desire to do so and actually do so. Such a condition would place the state only in the same situation as if the regents should be guilty of waste or mismanagement whereby they could not function without increased appropriations. If waste and mismanagement would not create a debt against the state, the issuance of these bonds would not do so. Such a condition would be referable only to the character of the management, and would not lead to constitutional difficulties."

There are a number of cases holding that where state educational institutions have been granted corporate existence, they are separate and independent legal entities, and may, if their charter powers so provide, contract debts and emit bond issues payable only out of their revenues, and that such debts are not obligations of the state. All of these cases are of course affected or ruled by the local laws, but it is

interesting to note that most of them have concluded that such institutional debts are not obligations of the state. We cite some of them: *Baker* v. *Carter,* 165 Okl. 116, 25 Pac. (2d) 747; *Fanning* v. *University of Minnesota,* 183 Minn. 222, 236 N. W. 217; *State* v. *Regents of University of New Mexico,* 32 N. M. 428, 258 Pac. 571; *Caldwell Bros.* v. *Board of Supervisors of Louisiana State University, etc.,* 176 La. 825, 147 So. 5; *State* v. *Regents University System of Georgia, supra; State* v. *Davis,* 59 N. D. 191, 229 N. W. 105; *State* v. *State Board of Education,* 97 Mont. 121, 33 Pac. (2d) 516.

▉▉▉ (d) The defendant attributes to section 10, article 11, of the Constitution, an intention or purpose to limit state educational institutions to two sources of revenue: (1) The federal income from institutional lands and investment of the proceeds of such lands; and (2) legislative appropriations to be met by taxation for the maintenance, development and improvement of such institutions. The provision concerning the federal revenues was evidently inserted in the Constitution as a restriction against the use of such funds for any other purpose than that for which Congress granted the lands to such institutions. The mandate to the legislature, found in the second sentence of said section 10, while it imports that the educational institutions of the state must be maintained and adequately developed and improved by taxation, does not make that resource the exclusive method. It simply means that it shall be the duty of the legislature to make whatever provision is necessary for the proper and efficient functioning of these institutions, but does not deny the legislature, or the institutions with the legislature's consent, the right to resort to other sources of revenue than that of state taxation for that purpose. If the educational institutions are limited to the federal

revenues mentioned, and to appropriations to be met by taxation, then they may not charge tuition or any fees or rentals, or receive donations or gifts, or charge for dormitory or athletic accommodations, etc. To hold such institutions are confined to the two sources of revenue mentioned would lead to absurd results and give to the language of section 10, *supra,* a meaning that was never intended.

█ (e) Section 6 of article 11 of the Constitution provides that the University and other state educational institutions shall furnish instruction "as nearly free as possible." Defendant insists that means instruction shall be entirely free, and therefore contends that, because the University has fixed a schedule of fees to be paid by students, faculty members, and others, as compensation for the accommodations received by them at such institution, it has violated said section 6. We think the language of the Constitution refutes this contention. There is no suggestion that the fees, rentals, etc., are excessive or other than reasonable, or are not as nearly free as possible.

█ Under the rule laid down in *Maricopa County Municipal Water Conservation District Number One* v. *La Prade, supra,* it being admitted that all the proceedings under the act are regular and in accordance therewith, and it further appearing that the act is in all respects constitutional, *mandamus* is the proper remedy. Therefore the alternative writ heretofore issued is made peremptory.

McALISTER, J., concurs.

LOCKWOOD, C. J., Dissenting.—I regret that I cannot concur in the conclusion reached by my associates. It would be of no value to anyone for me to state the reasons for my dissent, as it would have no effect upon the law as established for the state of

Arizona by the majority opinion. I hope, however, that when, as is inevitable in my belief, future attempts are made to apply the general principles set forth in that opinion to other efforts to avoid, if not to evade, the constitutional provisions which I believe have been misconstrued in the present case, the court will realize that it has been unwittingly following the *ignis fatuus* of temporary expediency and will return to sound principles before the state becomes hopelessly engulfed in a morass of debt.