528 P.2d 839

**FIREMAN'S FUND INSURANCE COMPA-NY, a corporation, et al., Appellants,**

v.

**ARIZONA INSURANCE GUARANTY AS-SOCIATION, a non-profit corpora-tion, et al., Appellees.**

**No. 1 CA–CIV 2038.**

Court of Appeals of Arizona,
Division 1,
Department A.

Nov. 21, 1974.

Rehearing Denied Jan. 13, 1975.
Review Granted Feb. 18, 1975.

Snell & Wilmer, by Mark Wilmer, Bruce Norton, Thomas J. Reilly, Phoenix, for appellants.

Stockton & Hing, by Robert Ong Hing, Phoenix, for appellee Arizona Ins. Guaranty Ass'n.

N. Warner Lee, Atty. Gen., by Fred W. Stork, III, Nicholas C. Guttilla, Phoenix, for appellee Arizona Department of Insurance.

## OPINION

DONOFRIO, Presiding Judge.

Plaintiffs-appellants have instituted this action to challenge the constitutionality of Article VI, Chapter III, Title 20, Arizona Revised Statutes, known as the "Arizona Insurance Guaranty Act", herein referred to as the "Act". The trial court found the Act to be constitutional.

The Act is based upon the National Association of Insurance Commissioners State Post Assessment Insurers Guaranty Association Model Bill adopted by the National Association of Insurance Commissioners (N.A.I.C.). Approximately 40 states have enacted the N.A.I.C. model bill into law.[1] Prior to the enactment of the legislation there was a nationwide and statewide call for protective legislation to prevent hardship on individuals who were insured by companies which became insolvent. The problem was most prevalent in the area of fire and casualty insurance which includes automobile liability insurance. Policyholders were left with unpaid claims and no protection was provided to policyholders of said companies against third-party claims. The principal aim as stated in the Act itself under the heading *Purpose of Act* is to " . . . avoid financial loss to claimants or policyholders because of the insolvency of an insurer." The general format of the legislation was the creation of a statutory association consisting of all insurers authorized to transact business in the state in the designated insurance lines. Assessments on said member insurers under the Act are made after the occurrence of an insolvency and after a determination as to the amount of losses or claims anticipated.

Appellant challenges the Act on four constitutional grounds.

## I. DOES THE ACT CONTRAVENE ARTICLE XIV, SECTION II OF THE ARIZONA CONSTITUTION, A.R.S.?

Article XIV, Section II provides:

"Corporations may be formed under general laws, but shall not be created by special Acts . . . ."

Article XIV, Section I provides:

"The term 'corporation,' as used in this Article, shall be construed to include all associations and joint stock companies having any powers or privileges of corporations not possessed by individuals or co-partnerships."

Appellants argue that the Act creates a corporation which falls within this constitutional prohibition of creating corporations by special acts. Only one pertinent case in Arizona has been found interpret-

[1] The N.A.I.C. Model Bill has been enacted into law by Alaska, Arizona, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia and Wyoming. California and Michigan enacted similar legislation prior to the N.A.I.C. Model Bill. New Jersey, New York and Wisconsin enacted guaranty fund legislation prior to the N.A.I.C. Model Bill.

ing this provision. In Board of Regents of University of Arizona v. Sullivan, 45 Ariz. 245, 42 P.2d 619 (1935), the Arizona Supreme Court discussed whether the Legislature could confer certain corporate powers upon the Board of Regents of the University of Arizona without violating Article XIV, Section II of the Arizona Constitution. Appellants argue that the court in upholding the power of the Legislature to clothe institutions of higher education with certain corporate powers, interpreted Article XI of the Arizona Constitution as containing a special mandate to the Legislature to enact laws for these educational institutions. Conversely, appellees argue that Board of Regents, supra, does not hold that only educational institutions are excepted from Article XIII and Article XIV, but that other exceptions exist as well. Without referring to any specific language within the opinion itself, our reading of the case cannot yield conclusively a finding that appellants' or appellees' interpretation is correct under the present circumstances. We thus find it necessary to interpret the constitutional prohibition in light of the policy meant to be served by it in connection with the purposes of the Act under consideration.

█ The constitutional provision prohibiting the creation of corporations by special acts is based in part on the policy of removing the danger of favoritism and corruption in the creation of corporations. Others have argued that these prohibitions are aimed at uniformity and convenience. See Fletcher, Cyclopedia of the Law of Corporations, Vol. I, §§ 169–170, pp. 663–667. The question then becomes, will the policy behind this constitutional constraint be weakened by allowing the statute to stand? We think no damage will occur.

█ The intent of the Legislature in passing the Act cannot be said to be granting a privilege to any group. Whether the organization be classified as an association or corporation need not be decided at this point, for the crucial inquiry is the purpose of the Act, in that the classification is un-

important if the Act has been created out of a public purpose. Whether a law is general or special is to be determined from the law itself. It is the substance of the act which determines its character. City and County of San Francisco v. Spring Valley Water Works, 48 Cal. 493 (1874).

█ It is stated in 82 C.J.S. Statutes § 179 at p. 296 that constitutional prohibitions against the creation of corporations or the grant of corporate powers are generally applied exclusively to private corporations, although in some jurisdictions municipal corporations are included within such provisions. See State ex rel. W. Va. Housing Development Fund v. Copenhaver, 153 W.Va. 636, 171 S.E.2d 545 (1969) where the court construed their constitutional provision prohibiting creation of a corporation by special act to apply only to private corporations and not to public corporations created for public purposes. In O'Malley v. Florida Insurance Guaranty Association, 257 So.2d 9 (Fla.1971), the Florida Supreme Court ruled that their insurance association modeled after the N. A.I.C. bill was not a special private corporation under their constitutional prohibition. The Florida constitutional provision, Art. 3, Sec. 11(a)(12) reads:

"There shall be no special law or general law of local application pertaining to: . . . private incorporation or grant of privilege to a private corporation; . . ."

This similar constitutional provision, coupled with the similarity of the statutes in both Arizona and Florida, is authority for finding the creation of the association by our Legislature to be within the bounds of its authority. The Guaranty Association serves the function of fulfilling a public need without private profit. It promotes the public welfare which is within the state's police power, by protecting those who have suffered loss of insurance protection through the insolvency of their insurers. In short, it is created for the benefit of the public. Thus, it must be found that the Act because of its manifest intent

does not abridge our constitutional prohibition in that it fulfills a necessary public purpose.

## II. DOES THE ACT CONSTITUTE AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY?

Appellants, recognizing that the line is dim between what is a constitutional and what is an unconstitutional delegation of legislative power, State v. Phelps, 12 Ariz.App. 83, 467 P.2d 923 (1970), urges this Court to shed the light on the Act as an improper delegation. In examining the constitutionality of a statute the court follows certain guidelines. There is a presumption in favor of the constitutionality of a legislative enactment. State v. Krug, 96 Ariz. 225, 393 P.2d 916 (1964). The court must be satisfied beyond a reasonable doubt that the statute is unconstitutional, Shaw v. State, 8 Ariz.App. 447, 447 P.2d 262 (1968), and a liberal construction be utilized in construing the legislation to uphold its constitutionality. Shaw v. State, supra. Also see New Times, Inc. v. Arizona Board of Regents, 110 Ariz. 367, 519 P.2d 169 (1974). Thus, our examination begins from this basis.

We do not believe that the Act delegates unlimited regulatory power to the Association with no prescribed restraint. However, because the Association is not a state administrative agency, it is argued that the law of delegation as it applies to state administrative agencies is inappropriate as the Association is not an agency of the state. Yet, it is important to note that the Association as organized is solely interested in pursuing a governmental purpose under the control of the Director, i. e., insuring the insurance of the public in the spec-

ified areas of the Act.[2] Therefore, it can be argued that the Association is akin to an administrative agency and should be analyzed in that context. Appellants believe that such an application is inappropriate because state agencies are directly responsible and answerable to the Legislature and dependent upon the Legislature for funding; in other words, that the Association by not being an agency is absolved of accountability and therefore the issue of improper delegation should be evaluated with greater scrutiny. We do not agree.

Appellants, although arguing that the law of delegation as it applies to state administrative agencies is inappropriate, offer no alternatives for analysis. In part they rely upon State v. Marana Plantations, 75 Ariz. 111, 252 P.2d 87 (1953) for this proposition. Yet, this case defines the standards of delegation necessary for a state administrative agency. The basis of appellants' argument that a stricter test be applied as to analyzing the question of delegation is the Association's lack of accountability to the Legislature. On its face this might appear to be so, but in practical application it is not. The Legislature retains the power to terminate the Association by repealing the Act as it was formed by legislative enactment. If abuse was evident, therefore, the existence of the Association could be ended. In addition, the Director of the Association is the State Insurance Director, § 20–661(4). Lord v. Arizona Corp. Commission, 9 Ariz.App. 34, 449 P.2d 51 (1968).[2a] Because of the special knowledge and skills possessed by the Director, the Legislature has authorized the Director to do things which it might not properly do itself and has set standards within which the Director is to operate. See A.R.S. §§ 20–663, 20–665, 20–666 and

---

2. See § 20–661(6)

2a. On January 28, 1969 the Governor of Arizona issued his proclamation declaring approval by the people of an amendment of the Constitution of Arizona removing from the Corporation Commission the licensing control and supervision of domestic and foreign insurers

and providing for the establishment of a Department of Insurance and appointment of a director thereof by the Governor. See 1969 Session Laws Arizona, Twenty-Ninth Legislature First Regular Session, 565–567; Arizona Constitution, Article 14, § 17; Arizona Constitution, Article 15, § 5; and A.R.S. § 20–101.

458

20-670. Furthermore, A.R.S. §§ 20-142, 20-156, 20-157 and 20-158 establish adequate standards and procedures for overseeing the Association so that it can be determined that there is compliance with the Act. It is therefore our judgment that the rules pertaining to administrative agencies are appropriate in this instance.

■ State v. Arizona Mines Supply Co., 107 Ariz. 199, 484 P.2d 619 (1971) sets forth a complete statement on the subject of delegation of powers. Within that analysis it cites from Department of Health v. Owens-Corning Fiberglas, 100 N.J.Super. 366, 242 A.2d 21 at 29-30 (1968) for the proposition that,

"A statute need establish no more than a sufficient basic standard, i. e., a definite policy and rule of action which will serve as a guide for the administrative agency, in order for the delegation of legislative power to be deemed valid. [citations omitted]."

The Act meets this standard for it states a clear purpose, the persons who constitute member insurers, the class of persons protected, the conditions and circumstances under which assessments are to be made, a formula for determining the amount to be assessed against each member insurer and the purposes for which the assessments are to be expended. In addition,

". . . And the standards which must accompany such grant of legislative power need not necessarily be set forth in express terms if they might reasonably be inferred from the statutory scheme as a whole." State v. Arizona Mines, supra, at 107 Ariz. 205, 484 P.2d at 625.

The specifics of the statute in conjunction with the inferential controls of the statute as a whole, combined with its relationship to other statutes, i. e., A.R.S. §§ 20-142, 20-156, 20-157 and 20-158, create a proper delegation of authority and thus is not violative of the separation of powers of our constitution.

## III. THE ACT VIOLATES THE DUE PROCESS REQUIREMENTS OF THE UNITED STATES CONSTITUTION

### A. PROCEDURAL ASPECT

Appellants complain that the Act fails to meet the requirements of procedural due process in six instances. These are:

1) A failure to assure that all insurance companies whose financial worth is to be made subject to the direction and action of the Board of Directors have a voice in their selection;

2) No provision by statute is made for the method by which the members of the Board of Directors are to be selected;

3) No indication is given as to how member insurers who qualify to join in the selection of the directors shall be identified;

4) The Act is silent with respect to any notice of hearing in determining amount due from member insurers or who are member insurers subject to assessment;

5) The statute is silent as to any requirements for notice and hearing in relationship to all functions of the Board of Directors; and

6) The statute calls for the organization of the Board of Directors by member insurers and that the Board submit the plan of operation to the Director, yet the plan of operation is to be prepared and adopted before the directors can be selected because the plan of operation is to spell out the terms and plans of the Board of Directors.

Essentially, appellants' complaint appears to be that the Act does not contain or make provision for adequate notice and opportunity to participate. Before an analysis of appellants' objection can be undertaken, it is necessary to have an understanding of basic due process notions in the present context. Procedural due process is a term not easily susceptible to pre-

cise explanation. 16 Am.Jur.2d, Constitutional Law § 548 (1964) indicates:

"Procedural due process may be defined as the aspect of due process which relates to the requisite characteristics of proceedings looking toward a deprivation of life, liberty or property; procedural due process makes it necessary that one whom it is sought to deprive of such a right must be given notice of this fact . . . he must be given an opportunity to defend himself . . . and the problem of the propriety of the deprivation, under the circumstances presented, must be resolved in a manner consistent with essential fairness."

The constitutional guaranties of due process of law do not require that parties shall be entitled to any particular form of action or method of procedure for the protection of rights or redress of wrongs. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Therefore, consideration of what procedural due process may require under any given set of circumstances must advance from a determination of the precise nature of the government function involved, as well as of the private interest affected by the governmental action. The Association serves an important and valuable public function as has been illuminated previously, and the imposition of procedural safeguards must be judged in light of the purpose and framework behind the statutes of its creation. The provisions of the Act applicable to certain casualty and other insurers doing business in the state appear to be within the Legislature's province to exercise under the police power for benefit of the public.

The insurance business is affected with a public interest and the state may by legislation control and regulate it. Employers' Liability Assurance Corp. v. Frost (Industrial Commission), 48 Ariz. 402, 62 P.2d 320 (1936). Thus, we are concerned with an exercise of a legislative power delegated to the Association.

A distinction exists regarding due process of law between a legislative hearing and an adversary proceeding. As said in Hart v. Bayless Investment & Trading Co., 86 Ariz. 379, 346 P.2d 1101 (1959):

"It is not necessary, in order to provide due process, that interested parties be present at stages of the legislative deliberations." 86 Ariz. at 389, 346 P.2d at 1108–1109.

In our opinion the Act is not without adequate procedural safeguards in the context of its purpose and structure. The Act provides guidelines for operation of the Association in A.R.S. § 20–664. A.R.S. § 20–665 requires the Association to submit a plan of operation to the Director of Insurance and sets forth internal procedures to be utilized in the plan of operation. The Act provides for representation of all member insurers (defined in A.R.S. § 20–661(6)) who are permitted to elect their own directors subject to the Director's approval. The Director under A.R.S. § 20–663 is to see that member insurers are fairly represented. Under A.R.S. § 20–665(C)(7) any member insurer aggrieved by any final action of the Association may appeal to the Director within thirty days after the action and decision. Furthermore, under A.R.S. § 20–666(C) anyone aggrieved by any final action or order of the Director may seek review as provided in A.R.S. §§ 20–161 to 20–166. These procedures are thus available to all member insurers. Although the possibility exists that the Association might exercise its power in an arbitrary and capricious way, this does not infer that the Act is invalid. As our Supreme Court said in Southwest Engineering Co. v. Ernst, 79 Ariz. 403, 291 P.2d 764 (1955):

"Merely because the possibility exists that there may be an arbitrary and capricious use of power legitimately delegated under the statute is not sufficient reason to entertain a presumption that the power granted will be so exercised. [citations omitted]." 79 Ariz. at 412, 291 P.2d at 770

It would be virtually impossible for the Legislature to promulgate comprehensive rules for the administrative procedures and functions of the various administrative agencies. The Association created, clothed with public purpose, must be allowed to make operative decisions free from the interference of adversary hearings in order to smoothly and efficiently function in fulfilling its purpose designed by the Legislature. So long as members have an available method of recourse for grievous actions, due process of law is not violated. To hold otherwise would stifle governmental processes rather than aid them. The Plan of Operation was intended by the Legislature to provide for the administration of the Association and is "to assure the fair, reasonable, and equitable administration of the association." A.R.S. § 20–665(A). All matters as indicated before are subject to review. As said in O'Malley v. Florida Insurance Guaranty Association, supra, 257 So.2d at p. 13, whose Association like the Arizona Association is based on the model bill:

"Adequate safeguards appear to be provided in the statute for the collection and use of trust funds so far as it is humanly possible by law to safeguard their collection and use. There appears to be conferred in the State Insurance Commissioner adequate supervisory authority over the organization and operation of the Guaranty Association to protect the public interest."

Appellants' complaint that members of the Board of Directors of the Association are to be selected for terms established by the Plan of Operation but that the Plan of Operation cannot be drawn up and selected until the Board of Directors has been appointed or selected ignores A.R.S. § 20–663 when read in conjunction with A.R.S. § 20–665. These sections indicate that the initial members of the Board of Directors are to be selected within sixty days after the effective date of the article in question. After the initial election, the Board members must prepare a Plan of Operation setting forth the term of office.

■ Appellants' complaint that the Association is exposed to an unlimited obligation is also in error. Appellants' exposure is limited to one percent of their Arizona net premiums. Claims are paid only to the extent funds are available under the one percent of net premiums assessment formula. See A.R.S. § 20–664(A)(3). In addition, the entire amount of "covered claims" [3] paid will not be entirely lost in that the Association will make recoveries out of the receivership of the insolvent insurer's assets. A.R.S. § 20–667. Thus, within the Act there are built-in adjustments which are fair, proper and protective of appellants' economic concerns.

## SUBSTANTIVE DUE PROCESS

■ In essence, appellants argue that the Act violates substantive due process in that the Act requires certain companies to become a financially contributing member of an Association that is organized to take care of obligations of like competitive insurance companies which the individual members and Association have no way to exercise any control over in terms of their method of operation. See § 20–664(A)(3) which provides:

" . . . The association may exempt or defer, in whole or in part, the assessment of any member insurer, if the assessment would cause the member insurer's financial statement to reflect amounts of capital or surplus less than the minimum amounts required for a certificate of authority by any jurisdiction in which the member insurer is authorized to transact."

Appellants argue that this means that the legislatures of other states, in passing capital and surplus legislation, regulate which members may be exempted from assessment. Even if this interpretation were

3. See § 20–661(3)

correct,[4] we do not believe that there is an infringement of substantive due process. Having previously determined that the Association is a creation of the states' police power, the test of validity of such a statute has been described by our Supreme Court in quoting 16 C.J.S. Constitutional Law § 198, p. 573, as follows:

" . . . the test of validity within the police power is whether or not ends sought to be attained are appropriate and the regulations prescribed are reasonable. The measure of reasonableness of a police regulation is what is fairly appropriate to its purpose under all circumstances, and not necessarily what is best; and the test of reasonableness is whether the attempted regulation make efficient constitutional guaranties and conserves rights, or is destructive of inherent rights." Myerson v. Sakrison, 73 Ariz. 308, 313, 240 P.2d 1198, 1201 (1952).

This Act meets such requirements. The business of insurance is affected with a public interest and as such is a proper subject of regulation and control by the state through the exercise of its police power in the interest of public convenience and the general good of the people. Employers Liability Assurance Corp. v. Frost, 48 Ariz. 402, 62 P.2d 320 (1936); 43 Am.Jur. 2d Insurance § 52. It is obvious that the result of the exercise of the police power in many instances will result in the abridgement of private rights. The sacrifice of private rights can be sustained only if the utilization of the police power attains some public object of sufficient necessity and importance to justly warrant the exertion of the power. Edwards v. State Board of Barber Examiners, 72 Ariz. 108, 231 P.2d 450 (1951). It is generally stated that the means adopted must be suitable to the end in view; that there must exist a real and substantial relation to their purpose; and that the infringement of private rights must not extend beyond the necessities of the situation. As was said in Nebbia v. N. Y., 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934):

" . . . If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio. . . ." 291 U.S. at 537, 54 S.Ct. at 516.

Thus, it is the court's function to decide whether it is feasible to say that the legislative decision is without a rational basis. We believe such a rational basis exists; that the means adopted to accomplish the Association's purpose are suitable; and that the infringement on private rights is minimal and constitutionally permissible as an exercise of the police power.

The history of the Model Bill drafted by the N.A.I.C. shows that the social and economic problems arising from insurance company insolvencies have been a concern to the federal government as well as to the states.[5] The fact that forty states, including Arizona, have enacted the essential elements of the N.A.I.C. Model Bill is a strong barometer that there exists a regulatory need and current usage of such legislation. The rational basis test is clearly met. In short, substantive due process remains unfettered. For a recent Washington case in accord see Aetna Life Ins. Co. v. Washington Life & Dis. I. G. Ass'n, 83 Wash.2d 523, 520 P.2d 162 (1974).

## IV. THE ACT VIOLATES THE EQUAL PROTECTION GUARANTEE OF THE UNITED STATES CONSTITUTION

Appellant argues that the Act is violative of the equal protection clause in that

4. § 20–664(A)(3) provides that the association *may* exempt, therefore such exemption is not mandatory.

5. See Memorandum of National Association of Insurance Commissioners, 660 E. Mason St., Milwaukee, Wisconsin 53202 Re: NAIC State Post Assessment Insurers Guaranty Association Model Bill. Prepared by the staff of the NAIC Central office Dec. 31, 1969.

**462**

the Act permits the Association to exempt or defer, in whole or in part, an assessment against a member insurer, with such exemption having no rational relationship to the fulfillment of the purpose of the Act and that the Act arbitrarily and capriciously allocates the economic cost of the operation of the Association among the general public. Although appellants' argument is not without merit, its persuasiveness and strength is unable to overcome the presumption of constitutionality.

 "The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). A classification having any reasonable basis must be upheld as long as the discrimination has a reasonable relationship to the differences. The insurance industry being one of public concern allows the legislature great latitude in adopting enactments in regulation thereof. German Alliance Ins. Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011 (1914). Because insurance is very much clothed with public interest and in part can be thought of as a depository of the money of the insured, how necessary their solvency is is manifest. It is precisely the purposes of the Act to guard against insolvencies and to reimburse those insured who are the victims of an insurance company insolvency. This purpose is accomplished by the provisions of the Act. The classification complained of by appellants is reasonable and is directly related to the purposes of the Act, i. e., the prevention of insolvencies and the protection of the policyholders of an insolvent or marginal insurer. Upon careful scrutiny we cannot find that the classification fails to exhibit a rational relationship to the accomplishment of a legitimate legislative goal.

Affirmed.

STEVENS, J., concurs.

EUBANK, Judge (dissenting).

I dissent. It is my opinion that the Arizona Insurance Guaranty Association Act, A.R.S. § 20–661 to § 20–675, as added by the Laws of 1970, Chapter 78, is unconstitutional under several provisions of the Arizona Constitution: (1) Article 4, Part 2, Section 19, Clause 13 which prohibits the legislature from enacting a special law granting to any corporation or association a "special or exclusive privileges, immunities or franchises"; (2) Article 14, Section 2 which requires that corporations be created under general law and not special law; (3) Article 2, Section 13 which requires that all corporations, other than municipal, have equal privileges or immunities; (4) Article 9, Section 1 which prohibits the surrender, suspension or contracting of the power of taxation; (5) Article 9, Section 7 which prohibits the state from loaning its credit in aid of, or making any donation or grant by subsidy or otherwise, to a corporation or association. In addition, the Act constitutes an unlawful delegation of legislative power and is void for that reason. Article 3 and Article 4, Part 1, Section 1. Finally, it violates Article 4, Part 2, Section 13 which requires that the subject of an Act be expressed in its title.

The legislature has created a "non-profit association", known as the Arizona Insurance Guaranty Association, whose Charter and Articles consist of statutes (A.R.S. § 20–661 to § 20–675) and a "plan of operation" (A.R.S. § 20–665) drawn up by its members, which mandatorally consist of all general insurance companies doing business in Arizona, i. e., regulated by the state, and which plan is approved by the Director of Insurance. The business of the association is conducted by a "board of directors" in whom the "powers" of the association are vested. The board of directors consists of from five to nine representatives of the member insurance companies selected by the companies and approved by the Director. The purpose of the act is:

" . . to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer,

to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers." (Laws 1970, Ch. 78, § 1).

The funds required for this purpose are provided for by granting the Board of Directors the power to "assess member insurers separately" for all of the expenses of the association and all claims arising from the insolvency of an insurance company.

A.R.S. § 20–664(B) empowers the association to:

"1. Appear in, defend, and appeal any action on a claim brought against the association.

2. Employ or retain such persons as are necessary to handle claims and perform other duties of the association.

3. Borrow funds necessary to effect the intent of this article in accord with the plan of operation.

4. Sue or be sued.

5. Negotiate and become a party to such contracts as are necessary to carry out the intent of this article.

6. Perform such other acts as are necessary or proper to effectuate the intent of this article.

7. Refund to the member insurers in proportion to the contribution of each member insurer to that account that amount by which the assets of the account exceed the liabilities, if, at the end of any calendar year, the board of directors finds that the assets of the association in any account exceed the liabilities of that account as estimated by the board of directors for the coming year."

While A.R.S. § 20–665(C) requires that the "plan of operation" shall:

"1. Establish the procedures whereby all the powers and duties of the association pursuant to § 20–664 will be performed.

2. Establish procedures for handling assets of the association.

3. Establish the amount and method of reimbursing members of the board of directors under § 20–663.

4. Establish procedures by which claims may be filed with the association and establish acceptable forms of proof of covered claims. Notice of claims to the receiver or liquidator of the insolvent insurer shall be deemed notice to the association or its agent and a list of such claims shall be periodically submitted to the association or similar organization in another state by the receiver or liquidator.

5. Establish regular places and times for meetings of the board of directors.

6. Establish procedures for records to be kept of all financial transactions of the association, its agents, and the board of directors.

7. Provide that any member insurer aggrieved by any final action or decision of the association may appeal to the director within thirty days after the action or decision.

8. Establish the procedures whereby selections for the board of directors will be submitted to the director.

9. Contain additional provisions necessary or proper for the execution of the powers and duties of the association."

In addition, A.R.S. § 20–664(A) authorizes the association to:

"4. Investigate claims brought against the association and adjust, compromise, settle, and pay covered claims to the extent of the association's obligation and deny all other claims.

5. Notify such persons as the director directs pursuant to paragraph 1 of subsection A of § 20–666.

6. Handle claims through its employees or through one or more insurers or other persons designated as servicing facilities. Designation of a servicing facility is subject to the approval of the director, but such designation may be declined by a member insurer.

7. Reimburse each servicing facility for obligations of the association paid by the facility and for expenses incurred by the facility while handling claims on behalf of the association and shall pay the other expenses of the association authorized pursuant to this article."

Further, the association is "exempt from payment of *all fees* and *all taxes* levied by this state or any of its subdivisions," A.R.S. § 20–671. (Emphasis added); and immunity from suit is granted everyone involved in the business of the association. (A.R.S. § 20–673).

The State Insurance Director, who is charged with the regulation of the insurance business in Arizona, has only a nominal role in the association with very little voice in its operation. After the directors are appointed and the plan of operation approved by the director, his duties consist of approving the appointment of new directors, when a vacancy occurs, and the duties required by A.R.S. § 20–666, as follows:

"A. . . .

1. Notify the association of the existence of an insolvent insurer not later than three days after he receives notice of the determination of the insolvency.

2. Upon request of the board of directors, provide the association with a statement of the net direct written premiums of each member insurer.

B. The director may:

1. Require that the association notify the insureds of the insolvent insurer and any other interested parties of the determination of insolvency and of their rights under this article. Such notification shall be by mail at their last known address, where available, but if sufficient information for notification by mail is not available, notice by publication in a newspaper of general circulation shall be sufficient.

2. Suspend or revoke, after notice and hearing, the certificate of authority to transact insurance in this state of any member insurer which fails to pay an assessment when due or fails to comply with the plan of operation. As an alternative, the director may levy a fine on any member insurer which fails to pay an assessment when due. Such fine shall not exceed five per cent of the unpaid assessment per month, except that no fine shall be less than one hundred dollars per month.

3. Revoke the designation of any servicing facility if he finds claims are being handled unsatisfactorily.

C. Any final action or order of the director under this article shall be subject to review as provided in article 2, chapter 1, title 20."

The Act provides for no other state executive branch control. For example, the association is not subject to state budgetary or fiscal controls; it is not subject to audit by the Auditor General; its rules and regulations do not have to be reviewed at a public hearing and then filed with the Secretary of State; it does not have to comply with the Administration Procedure Act or the Public Meeting Act; its officers and employees are not public officers or public employees and do not come under the extensive body of law providing for their protection and the protection of the public. In short, the association has the best of both worlds—it is a "non-profit association", operating under a special state charter with a "built-in" membership, performing a state function with funds collected under state law, and performed without regard to the restraints imposed on state agencies by law.

In my opinion, you cannot read Chapter 78, Laws of 1970, without concluding that the legislature intended and did create a very special corporation indeed! What other non-profit corporation or association has the statutory attributes and special advantages heretofore noted; what other non-profit corporation or association could enter competition in the market place with the Arizona Insurance Guaranty Association?

Another way to illustrate the unconstitutionality or "special nature" of this type of

association is to look at Title 32, A.R.S., and visualize the same organization created by Chapter 78, extended to each of the state agencies listed therein. For example, Realtors and the Real Estate Recovery Fund (A.R.S. § 32–2101 et seq.); Funeral Directors (A.R.S. § 32–1301 et seq.); Contractors (A.R.S. § 32–1101 et seq.) etc. If the various constitutional limitations on the power of the legislature, referred to above, don't apply to the association in question, then when would they ever apply; if they don't apply here they are meaningless and legislature is free, like Congress under its broad grant of powers under the United States Constitution to create special "public" corporations, to create special corporations for any public purpose.

The only reported cases involving the appellee that I am aware of are Arizona Insurance Guaranty Association v. Humphrey, 109 Ariz. 284, 508 P.2d 1146 (1973), Cooper Claims Service, Inc. v. Arizona Insurance Guaranty Association, 22 Ariz. App. 156, 524 P.2d 1329 (1974), and Treffenger v. Arizona Insurance Guaranty Association, 22 Ariz.App. 153, 524 P.2d 1326 (1974), wherein the constitutionality of the association's structure was not raised. The only question raised in Humphrey was: "Does the Arizona Insurance Guaranty Act, § 20–661 et seq., A.R.S. give the association the right to recover unearned commissions from agents of an insolvent insurance company in those cases wherein the unearned premiums have been paid by the association to the insurers?" The Supreme Court answered the question in the negative, holding that the Director of Insurance was entitled to the unearned premiums. In reaching this conclusion the court described the association as follows:

". . . The legislation gave the association the power to assess and receive funds from insurance companies doing business in the State of Arizona, and to reimburse members of the public who would be injured by virtue of the insolvency of insurance companies doing business in this State. The purpose of

the act as stated in Art. 6 of Title 20, Insurance, is as follows:

'The purpose of this act is to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers.'

§ 20–664, subsec. A, par. 2 provides:

'A. The association shall:

* * *

2. Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent.'

§ 20–661, subsec. 3 reads as follows:

' "Covered claim" means an unpaid claim, including one for unearned premium, which arises out of and is within the coverage of an insurance policy to which this article applies * * *'

It is not questioned that the plaintiff, Arizona Insurance Guaranty Association, is liable under this statute to the varied insureds of Liberty Universal Insurance Company for the full value of the unearned premiums due to the insureds, as this would be an obligation arising out of and 'within the coverage' of the insurance policy issued by the insolvent company.

It is the contention of the Arizona Insurance Guaranty Association, however, that since it is required to pay to the insureds the unearned premiums that it is entitled to the unearned commissions on said unearned premiums." (109 Ariz. at 285, 286, 508 P.2d at 1147, 1148)

The Supreme Court recognized that Chapter 78, Laws of 1970, imposed liability

on the association, but the fact that it also imposes liability on the "member insurer", by assessment, in the proportion that the net direct written premiums of the member insurer for the past year bears to the net direct written premiums of all member insurers for the past year, was not raised or discussed. (A.R.S. § 20–664(A)3). This power in the association is similar to that granted to the State Compensation Fund under A.R.S. § 23–983. In the latter instance, however, state fiscal controls and audit are provided for and the executive branch of government is utilized to implement the public purpose. Cooper Claims Service dealt only with the recovery of independent adjusters' fees from the association, while Treffenger held that the association was not liable under the provisions of a particular insurance policy.

This logically leads to the objection that the assessment power of the association represents a delegation by the legislature of the power to impose a premium tax. This simply cannot be done under our law. *Cf.* Home Builders Association of Central Arizona, Inc. v. Riddel, 109 Ariz. 404, 510 P.2d 376 (1973). A reading of A.R.S. § 20–664(A)3 shows that the association assesses a premium tax (a transaction privilege tax) on each member insurer on the basis of claims and expenses, and that upon non-payment the member insurer may be barred from transacting insurance business in the State of Arizona. *See* A.R.S. § 20–666(B)2. In addition, if the assessment would cause the member insurer's financial statement to reflect amounts of capital or surplus below the minimum amounts required for a certificate of authority by any jurisdiction in which the member insurer is authorized to transact business, "the association may exempt or defer, in whole or in part, the assessment of any member insurer", A.R.S. § 20–664(A)3. This obviously favors weak members over strong members and would place an unequal burden on them. In this regard the "classification" of the tax is constitutionally questionable. *Cf.* Apache

County v. Atchison, Topeka & Santa Fe Railway Co., 106 Ariz. 356, 476 P.2d 657 (1970).

Another disability is the title to Chapter 78, Laws of 1970, which gave no hint to a legislator that he was creating a non-profit association and clothing it with all of the powers referred to above. The title reads:

"Relating to insurance; Establishing a plan for the payment of claims under certain insurance policies to avoid excessive delay in payment and financial loss to claimants or policyholders because of insolvency of insurer; Providing a method of detection and prevention of insurer insolvencies; Amending Title 20, Chapter 3, Arizona Revised Statutes, by adding Article 6; Amending Sections 20–230 and 20–443, Arizona Revised Statutes, and amending Title 20, Chapter 3, Article 4, Arizona Revised Statutes, by adding Section 20–646."

Article 4, Part 2, § 13 of the Arizona Constitution provides:

"Every Act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be embraced in the title."

I believe that the title would have been sufficient if administration of the Act had been vested in the State Insurance Director. However, such was not the case. Instead, a new special agency was created by Chapter 78 to perform a valid state function and this creature of statute was the "subject" of the Act. The title merely states the purpose of the Act, and is therefore defective. Compare the title upheld in Board of Regents v. Sullivan, infra.

Finally, Board of Regents v. Sullivan, 45 Ariz. 245, 42 P.2d 619 (1935) is not authority for approval of the special corporate form of the association. The justification for upholding the Educational Institutions Act of 1934 in Sullivan is Article

11, Section 2 of the Arizona Constitution, which specifically requires the legislature to create such agencies by law.

For the foregoing reasons, and those stated in appellant's brief, I must dissent.